# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF FLORIDA, *ex rel.*,<br>[UNDER SEAL], ) ) ) ) | **COMPLAINT<br>FILED UNDER SEAL<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)** |
| Plaintiffs, ) ) | |
| v. ) ) | |
| [UNDER SEAL], ) ) | |
| Defendants. ) ) | |

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

13 DEC 15  AM11:54

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>STATE OF FLORIDA, *ex rel.*,<br>MCKENZIE STEPE,<br><br>        Plaintiffs,<br><br>v.<br><br>RS COMPOUNDING LLC d/b/a ZOE<br>SCRIPTS LABORATORY SERVICES,<br>LLC, and d/b/a WESTCHASE<br>COMPOUNDING PHARMACY, and JOHN<br>DOE CORPORATIONS 1-10, all whose true<br>names are unknown,<br><br>        Defendants. | **COMPLAINT**<br>**FILED UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730(b)(2)**<br><br>8:13-cv-3150-T-33AEP |

On behalf of the United States of America, Plaintiff and Relator McKenzie Stepe ("Relator") files this *qui tam* complaint against Defendants RS Compounding, LLC ("RS Compounding"), doing business as Zoe Scripts Laboratory Services, LLC ("Zoe Scripts") and doing business as Westchase Compounding Pharmacy ("Westchase"), and John Doe Corporations 1-10 (collectively, "Defendants") and alleges the following:

**I.      INTRODUCTION**

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America arising from false claims and statements made and presented by Defendants, or their agents and employees, in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA").  The violations consist of misrepresentations and knowing

$400<br>TPA 2091

omissions of material facts in connection with billing Medicare for certain compounding creams and gels.

2.     From at least 2011 through the present, Defendants improperly billed Medicare for compounding creams and gels, which were prescribed on pre-printed script pads, in order to generate improper and excessive fees from Medicare and other public and private health insurers including TriCare.

3.     Pursuant to the FCA, Relator seeks to recover damages and civil penalties on behalf of the United States of America arising from false or fraudulent claims that Defendants submitted or caused to be submitted to the United States Government for reimbursements or subsidies made by the United States pursuant to the Medicare Part D program.

## II.     SUMMARY OF THE ALLEGATIONS

4.     Zoe Scripts is a fictitious name of defendant RS Compounding LLC. Westchase is also a fictitious name of defendant RS Compounding LLC.

5.     Between 40% and 50% of Defendants' sales and revenues are earned from Medicare reimbursements.

6.     Traditionally, compounding pharmacies combined specific pharmaceuticals based upon a doctor's request for an individual patient.  Defendants, however, distribute massive quantities of pre-made compounds for both humans and animals throughout the country in a fashion similar to a large pharmaceutical manufacturing company.

7.     Defendants create creams and gels by compounding various amounts of medications into a single form.    Among its various products, Defendants market and distribute the following creams and gels:

a.     NeuroMax, which contains 15% ketamine, 6% gabapentin, 0.2% clonidine, 7% prilocaine, 3% baclofen, and 2% diclofenac;

b.     NeuroPlus-O, which contains 10% ketamine, 2% cyclobenzaprine, 3% diclofenac, 6% gabapentin, 2% tetracaine, and 5% orphenadrine;

c.     KetaLIGHT, which contains 3% ketamine, 2% diclofenac, 3% baclofen, 6% gabapentin, and 1% lidocaine;

d.     NeuroFlex, which contains 8% gabapentin, 8% dextromethorphan, 3% baclofen, 2% diclofenac, and 1% lidocaine;

e.     FlexUltra, which contains 2% baclofen, 2% cyclobenzaprine, 3% diclofenac, and 2% tetracaine; and

f.     NeuroGel, which contains 0.3% meloxicam, 3% topiramate, and 5% lidocaine.

8.     Defendants call their marketing scheme  the "1, 2, 3 strategy."  Defendants' scheme employs the use of pre-printed script pads that list the above drugs.

9.     Sales representatives are told by Defendants to fill in the physician's name, National Provider Identifier ("NPI") number, and to also write in "5" for the number of refills.

10.     Under the "1, 2, 3 strategy," Defendants' sales representatives "coach" physicians to number three products on the pre-printed script.  Physicians are told by Defendants' sales representatives to pick first the creams and gels that are covered by Medicare.  For example, the physician would write the numbers "1" and "2" next to NeuroGel and FlexGel, which are covered by Medicare Part D plans.

3

11.     If a patient is not covered by Medicare, the physician is told that Defendants will offer the patient a 120-gram bottle of the same cream or gel for $35.00. For example, according to Defendants' marketing materials, if NeuroGel or FlexGel are not covered by a particular patient's Medicare Part D plan, Defendants will offer that patient a 120-gram bottle of those drugs for $35.00.

12.     After they number their preferences for a patient, physicians are told to fax the pre-printed prescription to Defendants' offices along with the patient's insurance information. If the patient is covered by Medicare, then Defendants seek reimbursement from the federal government. Defendants have submitted claims for reimbursement to insurance companies and to Medicare for amounts ranging from $400.00 to $3,000.00 per bottles of the above-listed creams and gels.

13.     Because Defendants' sales representatives write in the number of refills (generally "5") on the pre-printed script pad, Defendants automatically ship refills to patients and seek Medicare reimbursements for those refills despite questionable (and unsupervised by a doctor) medical necessity.

14.     Defendants' scheme is fraudulent because it causes Medicare to reimburse Defendants for drugs at a rate more than ten times greater than the amount that Defendants invoice uninsured patients.

15.     At all relevant times, Defendants have known that the amounts they have submitted to Medicare for reimbursement have been fraudulent and grossly inflated because they have and continue to market and sell the same creams and gels to uninsured patients at a fraction of the price submitted to Medicare for reimbursement.

16.     On November 27, 2013, President Obama signed into law the Drug Quality and Security Act ("DQSA"), which modifies certain portions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 301, *et seq*.   The DQSA provides the U.S. Food and Drug Administration with the authority to regulate and monitor compounding pharmacies like Defendants.

17.     The United States timely asserts the causes of action alleged herein based on the filing of Relator's complaint in this action.

## III.    JURISDICTION AND VENUE

18.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. § 3729, *et seq*.

19.     In addition, the FCA specifically confers jurisdiction upon United States District Courts under 31 U.S.C. § 3732.  This court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in the Middle District of Florida.

20.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because certain of the acts complained of herein occurred in or affected the Middle District of Florida.

21.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America. Furthermore, Defendants are Florida limited liability companies with principal offices located at 12617 Race Track Road, Tampa, Florida 33626.

22.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendant until the Court so orders.

23.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in his possession contemporaneous with the filing of the Complaint.  Relator has complied with this provision by serving copies of this Complaint upon A. Lee Bentley, III, United States Attorney for the Middle District of Florida, and upon the Honorable Eric H. Holder, Attorney General of the United States.  Relator also previously provided substantially all material evidence and material information in her possession to the Office of the United States Attorney for the Middle District of Florida.

24.     Relator is not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because she has provided her information voluntarily to the Government before filing this Complaint, and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

IV.     **THE PARTIES**

25.     Relator McKenzie Stepe is a former sales representative for Zoe Scripts in New Jersey, and is a resident of Weehawken, New Jersey.  She has worked in the pharmaceutical sales industry for the past 10 years.  In November 2011, Zoe Scripts hired

Relator as a sales representative in a territory that included New Jersey and New York. She held her position with Zoe Scripts until she quit in February 2013.

26.     Relator is an original source and has direct, personal, and independent knowledge of the information upon which the allegations herein are based.

27.     According to its website (www.zoescripts.com), defendant Zoe Scripts is "a division of Westchase Compounding Pharmacy 12617 Race Track Road Tampa, Florida 33626."

28.     According to its website (www.westchasepharmacy.com), defendant Westchase operates its business from 12617 Race Track Road Tampa, Florida 33626.

29.     Zoe Scripts and Westchase are fictitious names of defendant RS Compounding LLC, which also operates its business from 12617 Race Track Road Tampa, Florida 33626 according to its filing with the Florida Secretary of State.

## V.     GOVERNING LAWS AND REGULATIONS

### A.     The False Claims Act

30.     Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained as a result of fraud against the United States. Further clarifying amendments were adopted in May 2009 and March 2010.

31.     The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval;" or "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or "knowingly makes, uses, or causes to be

made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G).  Any person found to have violated these provisions is liable for a civil penalty of up to $11,000 for each such false or fraudulent claim, plus three times the amount of the damages sustained by the Government.

32.    Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

33.    The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A).

34.    The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any Defendant.  The complaint remains under seal while the Government conducts an

8

investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

35.     The request of federal and state reimbursement for the provision of medical services which fails to meet the criteria set forth in federal and state statutes and regulations constitutes a violation of the FCA.   In this action, Zoe Scripts knowingly and routinely charged artificially inflated prices for its creams and gels in violation of the Medicare program.

**B.     Medicare**

36.     Medicare is a federal government-funded medical assistance program, primarily benefiting the elderly, that was created in 1965 when Congress enacted Title XVIII of the Social Security Act, ("Title XVII"), 42 U.S.C. § 1395 *et seq.*  Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health and Human Services ("HHS").   Since 2006, Medicare Part D has provided optional prescription-drug coverage to persons eligible for Medicare coverage.

37.     The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") amendment to Title XVIII created the Part D Voluntary Prescription Drug Benefit Program which, as of January 1, 2006, added certain prescription drug benefits, covered by Part D prescription drug plans and employment-based "qualified retiree prescription drug plans," to the benefits covered under Medicare.  *See* 42 U.S.C. §§ 1395w-101, 1395w-132; 42 C.F.R. § 423.882.

38.     Under the MMA, eligible Medicare Part D beneficiaries can obtain prescription drug coverage through private Part D prescription drug plans.  Potential Part D

Plan Sponsors, including various pharmacy benefit managers ("PBMs"), submit bids annually to CMS in order to participate in the Part D program. 42 C.F.R. § 423.265. CMS reviews and approves these bids, and Part D Plan Sponsors then enter into direct contracts with CMS to provide drug benefits to Part D participants.

39.    CMS makes prospective payments to Part D Plan Sponsors based on estimated costs. These include monthly direct subsidy premium payments for each Part D enrollee based on the plan's approved bid amount, reinsurance payments for eighty percent (80%) of the Plan Sponsor's costs for catastrophic coverage for Part D enrollee's above a certain threshold, and low-income subsidy ("LIS") payments for premium and cost-sharing charges for low income individuals. Part D Plans, in turn, provide CMS with documentation of their actual costs.

40.    Following the close of the benefit year, CMS reconciles a Part D Plan Sponsor's actual incurred prescription drug costs against the Plan Sponsor's bid.  If the Plan Sponsor's actual costs exceed estimated costs, the Sponsor may be able to recoup some of its costs through a risk-sharing arrangement with CMS.  If a Part D Plan Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of  the payments made to it  by CMS.

41.    Through the MMA's Retiree Drug Subsidy ("RDS") program, CMS contracts with employers or unions offering "qualified retiree prescription drug coverage" to their Medicare-eligible retirees ("RDS Plan Sponsors"), and provides a subsidy for a portion of their retiree drug costs between specified levels.

42.    The RDS subsidy can be claimed for each person enrolled in the employer's

plan who would otherwise be enrolled in Medicare Part D. The subsidy is equal to 28% of "allowable retiree costs," meaning the part of prescription drug costs that are actually paid by the employer or the retiree, net of any discounts, rebates or similar price concessions. 42 U.S.C. § 1395w–132.

43.     Potential RDS Plan Sponsors must submit an application for each year in which they plan to request a subsidy. Plan Sponsors elect a payment frequency during the application process, and may make as many as twelve interim payment requests per plan year. 42 CFR § 423.888(b)(1).  RDS Plan Sponsors or their representatives, such as PBMs acting on their behalf, must submit cost data to CMS' RDS Center before submitting any interim payment requests.   Those plans which have elected to only receive payments annually must submit cost data at the time of reconciliation. 42 CFR § 423.888(b)(2).

44.     Following the close of the benefit year, CMS reviews the total gross covered retiree prescription drug costs and actual cost adjustments, such as those related to manufacturer price concessions, submitted by the RDS Plan Sponsor after the plan year has ended, and makes a final subsidy payment determination. 42 CFR § 423.888(b)(4). CMS then reconciles the sum of any payments made to the RDS Plan Sponsor with its  final subsidy payment determination, and if the sum of the interim payments made is larger than the final subsidy payment determination, will initiate an overpayment recovery action.

45.     In order to receive a subsidy payment, RDS Plan Sponsors must specifically accept and agree to certain terms, including acknowledging, and requiring all subcontractors to acknowledge, that  information being provided in connection with the RDS application or subcontract,  is being used for the purpose of obtaining federal funds. *See e.g.*, 42 C.F.R.

423.884(c)(3).

46.    Federal law prohibits a person from knowingly presenting or causing to be presented to Medicare a claim for a medical or other item or service that the person knows or should know was "not provided as claimed," a claim for such items or services that is "false or fraudulent," or a claim that is "for a pattern of medical or other items or services that [the] person knows or should know are not medically necessary." 42 U.S.C. §§ 1320a-7a(a)(1)(A), (B) & (E).    Violation of this section is subject to a civil monetary penalty of $10,000 for each item or service, plus damages measured as three times the amount of each claim submitted, and exclusion from further participation in the programs.

47.    According to the FDA's Compliance Policy Guide for FDA Staff and Industry concerning Pharmacy Compounding:

> "when the scope and nature of a pharmacy's activities raise the kinds of concerns normally associated with a drug manufacturer and result in significant violations of the new drug, adulteration, or misbranding provisions of the Act, FDA has determined that it should seriously consider enforcement action.    In determining whether to initiate such action, the Agency will consider whether the pharmacy engages in any of the following acts: 1. Compounding of drugs in anticipation of receiving prescriptions, except in very limited quantities in relation to the amounts of drugs compounded after receiving valid prescriptions ... 6. Using commercial scale manufacturing or testing equipment for compounding drug products."

CPG    Sec.    460.200    (Reissued    05/29/2002)    (available    at http://www.fda.gov/ICECI/ComplianceManuals/CompliancePolicyGuidanceManual/ucm074398.htm#INTRODUCTION).

## VI.    SPECIFIC ALLEGATIONS

48.    Defendants employ approximately 150 sales representatives nationwide.

49.    Defendants manufacturer creams and gels on an industrial scale similar to large pharmaceutical companies.  Defendants create these creams and gels in anticipation of receiving prescriptions.

50.    Defendants market their products by providing physicians with pre-printed script pads that list the creams and gels.  The following is a copy of a pre-printed script:



Zoë  Life Improving Prescriptions
Customer Service: 800-925-5046 Ext 320  Fax: 888-513-6914
Please Fax Demographics and Insurance Information
a division of
WESTCHASE COMPOUNDING PHARMACY

Patient: _____  Physician: _____
DOB: _____  Address: _____
Address: _____
_____  Phone#: _____
Cell#: _____  Other#: _____  NPI#: _____
E-Mail: _____  DEA#: _____

*** Apply 1-2 Pumps (1.5g/pump) 3-4 times a day as needed

☐ NeuroMax (KGCPBD)    ☐240g  ☐180g  ☐120g  Refills: _____
  Ketamine 15%  Gabapentin 6%  Clonidine 0.2%  Prilocaine 7%  Baclofen 3%  Diclofenac 2%

☐ NeuroPlus-O (KCDGTO) ☐240g  ☐180g  ☐120g  Refills: _____
  Ketamine 10%  Cyclobenzaprine 2%  Diclofenac 3%  Gabapentin 6%  Tetracaine 2%  Orphenadrine 5%

☐ KetaLIGHT (KDBGL)    ☐240g  ☐180g  ☐120g  Refills: _____
  Ketamine 3%  Diclofenac 2%  Baclofen 3%  Gabapentin 6%  Lidocaine 1%

☐ NeuroFlex (GDBDL)    ☐240g  ☐180g  ☐120g  Refills: _____
  Gabapentin 8%  Dextromethorphan 8%  Baclofen 3%  Diclofenac 2%  Lidocaine 1%

☐ FlexUltra (BCDT)     ☐240g  ☐180g  ☐120g  Refills: _____
  Baclofen 2%  Cyclobenzaprine 2%  Diclofenac 3%  Tetracaine 2%

☐ NeuroGel (NMTL)      ☐240g  ☐180g  ☐120g  Refills: _____
  Meloxicam 0.3%  Topiramate 3%  Lidocaine 5%

ADD TO FORMULATION

Physician's Signature: _____  Date: _____

51.    Defendants directs its sales representatives to write in the physician's name and address, and the number "5" on each refill line.  Sales representatives also "coach" physicians to use Defendants' "1, 2, 3 strategy."

52.    Defendant Zoe Scripts' Vice President of Marketing, Jon Taylor, described Defendants' "1, 2, 3 strategy" in an email dated November 27, 2012, as follows:

Frustrated with unfilled scripts? Try a 1, 2, 3 strategy with your

13

physicians.

As you know your docs have the option of ranking their preference on the script pad. Coach them to a 1, 2, 3 strategy.

1. NeuroMax – If not covered, then Option 2
2. NeuroFlex – If not covered patients receive 120g @ $35.
3. NeuroGel – Covered by most Medicare Part D plans and if not patients receive 120g @ $35. Also some of these are paying above $100 so you will receive sales credit.

53.    Under Defendants' "1, 2, 3 strategy," physicians are coached to choose their top three preferences for each cream or gel based on the active ingredients.

54.    Under this marketing scheme, Defendants instruct sales representatives to "coach" physicians to write number "1" next to either NeuroMax, NeuroPlus-0 or KetaLIGHT.   Each of these creams contain ketamine, which provides the highest reimbursement rate.  Ketamine is a Schedule III controlled substance.  If ketamine is not covered, then none of these three drugs will be covered.

55.    To ensure coverage of prescription, Defendants instruct sales representatives to "coach" physicians to write a number "2" next to either NeuroFlex or FlexUltra. NeuroFlex and FlexUltra do not contain ketamine.  NeuroFlex contains gabapentin, and FlexUltra contains baclofen.  These two creams have the second-highest reimbursement rates of Defendants' drugs, if they are covered.

56.    Finally, Defendants instruct sales representatives to "coach" physicians to write a "3" next to NeuroGel, which has the lowest reimbursement rate of Defendants' drugs.

57.    Additionally, Defendants submit claims for reimbursement to Medicare Part D plans for amounts that grossly exceed the actual value of its products.   The true value of Defendants creams and gels is substantially less than the amounts it bills to Medicare.

58.     Defendants sell 120-gram bottles of their creams and gels to uninsured patients for $35.00.

59.     Relator is informed and believes that she received commissions ranging from $50.00 to over $100.00 on Medicare Part D reimbursements, which represents approximately 10% of the sale amount.

60.     Based upon her experience while employed by Defendants, Relator believes that Defendants have submitted, and continue to submit claims for Medicare reimbursements for at least $500.00 per bottle of the creams and gels Defendants sell to uninsured patients for $35.00.

61.     In fact, in order to boost sales revenues, Defendants have focused their marketing on Medicare patients.  Defendant Zoe Scripts' Vice President of Marketing, Jon Taylor, emailed sales representatives on March 2, 2013 as follows:

> Medicare Formulas! The Gel formulations are often covered by
> Medicare Part D which means potential sales credit for you.
> We are adding a FlexGel formula to go with the NeuroGel
> formula. This provide[s] a more neuropathic and inflammatory
> choice for these patients. Additionally these formulas are set
> apart on the prescription pad to remind the physician of the
> [Medicare Part D] insurance coverage.

62.     By targeting patients with Medicare Part D coverage and then seeking reimbursements at inflated prices for drugs by concealing the true value of its creams and gels, Defendants continue to violate the FCA.

63.     In addition, Defendants promote these compounds to treat serious medical conditions.

64.     Defendants claim that its creams and gels treat, among many symptoms, the

following medical conditions: peripheral neuropathy; carpal tunnel syndrome; chemo induced neuropathy; diabetic neuropathy; phantom limb pain; fibromyalgia; sciatica; tendonitis; plantar fasciitis; and arthritis.

65.    Defendants, however, do not train their sales representatives regarding proper and improper use, or potential contra-indications or warnings. Defendants did not offer or provide Relator with any formal training or educate her or any sales representatives about the efficacy or proper use of their products while she was employed.

66.    Defendants also do not sufficiently inform patients about the proper use of their compounds for these medical conditions. Defendants provide physicians with the following basic instructions that are part of the pre-printed script pads:



67.    These ten instructions do not provide specific information about Defendants'

16

differing compounds, and appear on a promotional materials rather than in a package insert. Defendants do not provide patients with additional instructions or precautions.

68.     Despite the fact that Defendants do not provide sufficient warnings to patients, especially about the effects of Ketamine, Defendants nevertheless encourage sales representatives to visit OBGYNs to promote their creams and gels.   In fact, sales representatives facilitate providing samples to OBGYNs and other physicians.

69.     Defendants encourage sales representatives to fill out requests for samples of these pre-made compounds on behalf of physicians while visiting their offices.   Sales representatives are instructed to fax these requests, which are labeled by sales representatives as "for office use," to Defendants from the physician's office.

70.     Under the FCA, claims for Defendants' creams and gels have been and continue to be fraudulent because the claim submitted for reimbursement is based upon illegal marketing.   If government-funded health insurance programs had been aware that Defendants' drugs were prescribed as a result of the conduct alleged in this Complaint, they would not have paid the claims submitted as a result of Defendants' wrongdoing.

## VII. CLAIMS FOR RELIEF

### <u>FIRST CLAIM</u>

**(False Claims Act: Presentation of False Claims – 31 U.S.C. § 3729(a)(1)(A))**

71.     Relator repeats and re-alleges the allegations contained in paragraphs 1-70 of this complaint as if fully set forth herein.

72.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented false or

fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

73.    As a result, the Government has suffered damages in the form of millions of dollars in unearned Medicare payments made to Defendants.

## SECOND CLAIM

### (False Claims Act: Making or Using a False Record of Statement to Cause a Claim to be Paid – 31 U.S.C. § 3729(a)(1)(B))

74.    Relator repeats and re-alleges the allegations contained in paragraphs 1-73 of this complaint as if fully set forth herein.

75.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have knowingly made, used, or caused to be made or used, false record or statements – *i.e.*, the false certifications and representations made or caused to be made by Zoe Scripts – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

76.    As a result, the Government has suffered damages in the form of millions of dollars in unearned Medicare payments made to Defendants.

## THIRD CLAIM

### (False Claims Act: Making or Using a False Record of Statement to Avoid an Obligation to Refund– 31 U.S.C. § 3729(a)(1)(G))

77.    Relator repeats and re-alleges the allegations contained in paragraphs 1-76 of this complaint as if fully set forth herein.

78.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have knowingly made, used, or caused to be made or used, false records or false statements – *i.e.*, the false certification made or caused to be made by

18

Defendants – material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government.

79.     As a result, the Government has suffered damages in the form of millions of dollars in unearned Medicare payments made to Defendants.

## FOURTH CLAIM

### (False Claims Act: Conspiracy – 31 U.S.C. § 3729(a)(1)(C))

80.     Relator repeats and re-alleges the allegations contained in paragraphs 1-79 of this complaint as if fully set forth herein.

81.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have conspired to make or present false or fraudulent claims and performed one or more acts to effect payment of false or fraudulent claims.

82.     As a result, the Government has suffered damages in the form of millions of dollars in unearned Medicare payments made to Defendants.

## FIFTH CAUSE OF ACTION

### (Florida False Claims Act: Fla. Stat. Ann. §§ 68.081, *et seq.*)

83.     Relator repeats and re-alleges the allegations contained in paragraphs 1-82 of this complaint as if fully set forth herein.

84.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

85.     By virtue of the acts described above, Defendants knowingly made, used, or

caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

86.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

87.     By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

88.     Pursuant to Fla. Stat. Ann. § 68.082(2) & (3), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.


## VIII.   DEMANDS FOR RELIEF

**WHEREFORE,** Relator, on behalf of the United States Government demands judgment against Defendants ordering that:

a.     Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government sustained because of Defendants' actions which Relator currently estimates to be millions of dollars, plus civil penalty of not less than $6,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq.*;

b.     Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. §

3730(d) of the False Claims Act and/or any other applicable provision of law;

      c.      Relator be awarded all costs and expenses of this action, including attorneys fees and costs as provided by 31 U.S.C. § 3730(d) and any other applicable provision of law; and

      d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**WHEREFORE,** Relator, on behalf of the State of Florida demands judgment against Defendants ordering that:

      e.      Relator and the State of Florida be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by the State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within the State, all as provided by Fla. Stat. Ann. § 68.082;

      f.      Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to Fla. Stat. Ann. § 68.085;

      g.      Relator be awarded all costs and expenses associated with each of the pendent State claims, plus attorney's fees as provided pursuant to Fla. Stat. Ann. § 68.086;

      h.      Relator and the State of Florida be awarded such other and further relief as the Court may deem to be just and proper.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.

Dated:  December 16, 2013

By:  _____

G. Wrede Kirkpatrick, Esq.
Florida Bar No.  984116
CONWELL KIRKPATRICK, P.A.
2701 North Rocky Point Drive
Suite 1030
Tampa, Florida  33607
(813) 282-8000
(813) 282-8800 (fax)
wkirkpatrick@ckbusinesslaw.com
www.CKBusinessLaw.com

Robert A. Magnanini
Daniel Mee
Of Counsel
STONE & MAGNANINI LLP
150 John F. Kennedy Parkway, 4th Floor
Short Hills, New Jersey 07078
(973) 218-1111
RMagnanini@stonemagnalaw.com
DMee@stonemagnalaw.com

*Attorneys for Plaintiff/Relator McKenzie Stepe*

22