## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF VIRGINIA, the COMMONWEALTH OF MASSACHUSETTS, and the States of CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, NEVADA, NEW JERSEY, NEW MEXICO, OKLAHOMA, TENNESSEE, TEXAS, and the policyholders of XYZ Nos. 1-10 Insurance Companies,<br><br>*ex rel.*, MCKENZIE STEPE,<br><br>            Plaintiffs,<br><br>    v.<br><br>RS COMPOUNDING LLC d/b/a ZOE SCRIPTS LABORATORY SERVICES, LLC, and d/b/a WESTCHASE COMPOUNDING PHARMACY, RENIER GOBEA, STEPHEN M. CADDICK, Pharm.D., and JOHN DOE CORPORATIONS 1-10, all whose true names are unknown,<br><br>            Defendants. | **FIRST AMENDED COMPLAINT FILED PUBLICLY PURSUANT TO COURT'S MAY 1, 2017 UNSEALING ORDER**<br><br>Case No. 8:13-cv-3150-T-33AEP |

On behalf of the United States of America, the Commonwealth of Virginia, the

Commonwealth of Massachusetts, and the States of California, Colorado, Delaware,

Florida, Georgia, Illinois, Indiana, Louisiana, Maryland, Nevada, New Jersey, New

Mexico, Oklahoma, Tennessee, and Texas (the "FCA States"), and the policyholders of certain presently unknown private insurance companies (captioned as XYZ Nos. 1-10 Insurance Companies), Plaintiff and Relator McKenzie Stepe ("Relator") files this *qui tam* First Amended Complaint against Defendants RS Compounding, LLC ("RS Compounding"), doing business as Zoe Scripts Laboratory Services, LLC ("Zoe Scripts") and doing business as Westchase Compounding Pharmacy ("Westchase") (collectively, "RS Compounding" or the "Company"), Renier Gobea, Stephen M. Caddick, Pharm.D., and John Doe Corporations 1-10 (collectively, "Defendants") and alleges the following:

## I.  INTRODUCTION

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the FCA States arising from false claims and statements made and presented by Defendants, or their agents and employees, in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA") and its various state-level equivalents.  The violations consist of misrepresentations and knowing omissions of material facts in connection with billing TRICARE, Medicare, and Medicaid for certain compounding creams and gels.

2.      This is also an action to recover treble damages and civil penalties from Defendants for knowingly and/or recklessly presenting or causing to be presented false or fraudulent health care claims to the States of California and Illinois, and to presently unknown private insurance companies (captioned as XYZ Nos. 1-10 Insurance Companies) operating or insuring policyholders in those states, pursuant to the California

Insurance Frauds Prevention Act, Cal. Ins. Code §§ 1871**,** *et seq*., and the Illinois Claims Fraud Prevention Act, 740 I.L.C.S. §§ 92/1, *et seq*.

3.      From at least 2011 through the present, pursuant to Defendants Mr. Gobea's and Dr. Caddick's directives, Defendant RS Compounding improperly billed TRICARE, Medicare, Medicaid, and private insurers for compounding creams and gels, which were prescribed on pre-printed script pads containing Zoe Scripts' name and logo, in order to generate improper and excessive fees from TRICARE, Medicare, Medicaid, and other public and private health insurers.

4.      Pursuant to the FCA and its state-level equivalents, Relator seeks to recover damages and civil penalties on behalf of the United States of America and the FCA States arising from false or fraudulent claims that Defendants submitted or caused to be submitted to the United States Government and the various state governments for reimbursements or subsidies made by the United States and the FCA States pursuant to the Medicare Part D program, TRICARE, and Medicaid.

## II.      SUMMARY OF THE ALLEGATIONS

5.      Zoe Scripts is a fictitious name of defendant RS Compounding LLC. Westchase is also a fictitious name of defendant RS Compounding LLC.

6.      At least 40% and 50% of Defendants' sales and revenues are earned from Medicare and TRICARE reimbursements.

7.      Traditionally, compounding pharmacies combined specific pharmaceuticals based upon a doctor's request for an individual patient.  Defendants, however, distribute massive quantities of pre-made compounds for both humans and

animals throughout the country in a fashion similar to a large pharmaceutical manufacturing company.  By way of example, in or about 2014, RS Compounding was filling 200 to 220 prescriptions daily, whereas a typical, stable compounding pharmacy would fill approximately 45 to 50 prescriptions daily.

8.      Defendants create creams and gels by compounding various amounts of medications into a single form.  Among its various products, Defendants market and distribute the following creams and gels:

    a.      NeuroMax, which contains 15% ketamine, 6% gabapentin, 0.2% clonidine, 7% prilocaine, 3% baclofen, and 2% diclofenac;

    b.      NeuroPlus-O, which contains 10% ketamine, 2% cyclobenzaprine, 3% diclofenac, 6% gabapentin, 2% tetracaine, and 5% orphenadrine;

    c.      KetaLIGHT, which contains 3% ketamine, 2% diclofenac, 3% baclofen, 6% gabapentin, and 1% lidocaine;

    d.      NeuroFlex, which contains 8% gabapentin, 8% dextromethorphan, 3% baclofen, 2% diclofenac, and 1% lidocaine;

    e.      FlexUltra, which contains 2% baclofen, 2% cyclobenzaprine, 3% diclofenac, and 2% tetracaine; and

    f.      NeuroGel, which contains 0.3% meloxicam, 3% topiramate, and 5% lidocaine.

9.      Defendants Mr. Gobea and/or Dr. Caddick created RS Compounding's marketing scheme, which they called the "1, 2, 3 strategy."  Defendants' scheme employs the use of pre-printed script pads that list the above drugs.

10.      Defendants Mr. Gobea and/or Dr. Caddick have instructed RS Compounding's sales representatives to fill in the physician's name, National Provider

Identifier ("NPI") number, and to also write in "6" for the number of refills, regardless of actual patient need.

11.     When Relator started working for Defendants, they required that their prescriptions contain prepopulated check marks for the most expensive compounds RS Compounding sold, thereby placing the burden on the prescribing physicians to cross out the check mark and check off another product.

12.     In addition, the Company directed its sales representatives to work with the IT staff or administrators handling their physicians' electronic medical records ("EMR") systems to add the Company's compounds into the systems so that the compounds would be prepopulated and "readily available to share with customers" (referred to as "EMR Support").  Because the Company's compounds were not FDA-approved, the compounds had to manually be added to the EMR systems.  The Company claimed that by setting up EMRs with the physicians it was providing "expedited processing and shipping."  Although the Company's written materials indicated that only non-controlled substance compounds were able to be E-scribed and controlled substance compounds (e.g., ketamine) had to be faxed or mailed, the Company accepted E-scribed controlled substance compounds.

13.     Sales representatives were explicitly instructed to not contact the Company's customer service department to ask any questions about EMR Support. Instead, they were told to direct their questions to Virgil Valdes, who was RS Compounding's Chief Operating Officer at the time.

14.     Under the "1, 2, 3 strategy," Defendants' sales representatives "coach" physicians to number three products on the pre-printed script.  Physicians are told by Defendants' sales representatives to pick first the creams and gels that are covered by Medicare.  For example, the physician would write the numbers "1" and "2" next to NeuroGel and FlexGel, which are covered by Medicare Part D plans.

15.     If a patient is not covered by Medicare, Medicaid, TRICARE or a private insurer, the physicians are told that Defendants will offer the patient a 120-gram bottle of the same cream or gel between $15.00 and $45.00.  For example, according to Defendants' marketing materials, if NeuroGel or FlexGel are not covered by a particular patient's Medicare Part D plan, Defendants will offer that patient a 120-gram bottle of those drugs for $15.00.

16.     RS Compounding's Vice President of Sales and Marketing, Jon Taylor, instructed the Company's sales representatives to "fill out a sample prescription and highlight how you are suggesting they fill it out . . . .  Repeating your messaging on this until it sticks."

17.     After they number their preferences for a patient, physicians are told to fax the pre-printed prescription to Defendants' offices along with the patient's insurance information.  If the patient is covered by Medicare or TRICARE, then Defendants seek reimbursement from the federal government.  Defendants have submitted claims for reimbursement to insurance companies and to Medicare for amounts ranging from $400.00 to $3,000.00 per bottle of the above-listed creams and gels. Defendants regularly billed TRICARE $1,200.00 for the same 120-gram bottle that they charged uninsured

6

patients between $15.00 and $45.00 for.  Mr. Gobea and/or Dr. Caddick knowingly participated in setting these prices and in causing the fraudulent claims to be submitted to Medicare, Medicaid, and private insurers for reimbursements.

18.      Because Defendants' sales representatives write in the number of refills (generally "6") on the pre-printed script pad and (at least during Relator's first year at the Company) prepopulate a check mark for the most expensive products RS Compounding sold, Defendants automatically ship refills to patients — often of the most expensive products if the physician did not cross out the check mark and check off a different compound — and seek TRICARE, Medicare, Medicaid, and private insurance reimbursements for those refills despite questionable (and unsupervised by a doctor) medical necessity.

19.      Defendants' scheme is fraudulent because it causes TRICARE, Medicare, Medicaid, and private insurers to reimburse Defendants for drugs at rates ranging in excess of ten times greater than the amount that Defendants invoice uninsured patients.

20.      At all relevant times, Defendants have known that the amounts they have submitted to TRICARE, Medicare, Medicaid and private insurers for reimbursement have been fraudulent and grossly inflated because they have and continue to market and sell the same creams and gels to uninsured patients at a fraction of the price submitted to TRICARE, Medicare, Medicaid and private insurers for reimbursement.

21.      On November 27, 2013, President Obama signed into law the Drug Quality and Security Act ("DQSA"), which modifies certain portions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 301, *et seq*.  The DQSA provides the U.S.

Food and Drug Administration with the authority to regulate and monitor compounding pharmacies like Defendant RS Compounding.

22.     The United States and the FCA States timely assert the causes of action alleged herein based on the filing of Relator's complaint in this action.

## III.     JURISDICTION AND VENUE

23.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the subject matter of this civil action because it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. § 3729, *et seq*.

24.     In addition, the FCA specifically confers jurisdiction upon United States District Courts under 31 U.S.C. § 3732.  This court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in the Middle District of Florida and supplemental jurisdiction over the state law claims pursuant to 31 U.S.C. § 3732(b) because they arise from the same transaction or occurrence alleged herein with respect to the FCA.

25.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because certain of the acts complained of herein occurred in or affected the Middle District of Florida.

26.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because the False Claims Act authorizes nationwide service of process and Defendants have sufficient minimum contacts with the United States of America. Furthermore, Defendant RS Compounding (d/b/a as Zoe Scripts and Westchase) is a Florida limited liability company with a principal office located at 12617 Race Track

Road, Tampa, Florida 33626, and at all relevant times described herein, the individual Defendants Mr. Gobea and Dr. Caddick resided in Tampa, Florida.

27.     In accordance with the Court's May 1, 2017 unsealing Order, this First Amended Complaint has been publicly filed and shall be served on the Defendants.

28.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the First Amended Complaint and/or a written disclosure of substantially all material evidence and material information in her possession contemporaneous with the filing of the First Amended Complaint.  Relator has complied with this provision by serving copies of this First Amended Complaint upon W. Stephen Muldrow, Acting United States Attorney for the Middle District of Florida, and upon the Honorable Jefferson "Jeff" Sessions, III, Attorney General of the United States.  Relator also previously provided substantially all material evidence and material information in her possession to the Office of the United States Attorney for the Middle District of Florida.

29.     With the exception of the Government's recent partial intervention in this matter by way of her prior complaint, Relator is not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" given that she has provided her information voluntarily to the Government before filing her original Complaint, and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## IV.    THE PARTIES

### *Relator*

30.    Relator McKenzie Stepe is a former sales representative for RS Compounding, doing business as Zoe Scripts, in New Jersey, and is a resident of North Haledon, New Jersey.  She has worked in the pharmaceutical sales industry for more than 10 years.  In November 2011, Zoe Scripts hired Relator as a sales representative in a territory that included New Jersey and New York.  She held her position with Zoe Scripts until she quit in February 2013.

31.    Relator is an original source and has direct, personal, and independent knowledge of the information upon which the allegations herein are based.

### *Defendant Pharmacy*

32.    According to its website (www.zoescripts.com), defendant Zoe Scripts is "a division of Westchase Compounding Pharmacy 12617 Race Track Road Tampa, Florida 33626."

33.    According to its website (www.westchasepharmacy.com), defendant Westchase operates its business from 12617 Race Track Road Tampa, Florida 33626.

34.    Zoe Scripts and Westchase are fictitious names of defendant RS Compounding LLC, which also operates its business from 12617 Race Track Road, Tampa, Florida 33626, according to its filing with the Florida Secretary of State.

*Defendant Principals*

35.     Defendant Renier Gobea co-founded RS Compounding (the "R" stands for Renier) with Defendant Dr. Caddick in 2004.  Mr. Gobea is not a licensed pharmacist.  At some point after founding the company, Mr. Gobea sold his ownership interest to Dr. Caddick.   In or around February 2014, Mr. Gobea returned to RS Compounding after purchasing Dr. Caddick's ownership interest for, at least, several million dollars.   Mr. Gobea is the current owner and director of RS Compounding.   He oversees all of RS Compounding's operations, including coordinating the training of RS Compounding's sales representatives.  He is approximately 41-years-old and resides in Tampa, Florida, in a home estimated to be worth in excess of $1,800,000.[1]  Mr. Gobea is involved in several business ventures, including serving as a principal of the real estate development firm Gobea Capital and as an investor in Ducky's Sports Bar and The Hydeout Lounge.[2]  Mr. Gobea has also been identified as an officer of Fortis Lab Management, LLC; Gobea Capital Oregon, LLC; Gobea Hospitality, LLC; and Renierx Corp.

36.     Defendant Stephen M. Caddick, Pharm.D., co-founded RS Compounding (the "S" stands for Stephen) with Mr. Gobea in 2004.  He is a licensed pharmacist and was a principal and the director at RS Compounding from its inception until he sold his ownership interest to Mr. Gobea in or around February 2014.  Prior to his departure, Dr. Caddick oversaw all of RS Compounding's operations, including the training of RS

---

[1]     Zillow,     https://www.zillow.com/homes/for_sale/45111540_zpid/globalrelevanceex_sort/27.91684,-82.453329,27.914546,-82.457357_rect/17_zm/ (last visited Apr. 6, 2017).

[2] *Gobea Capital and Sight Real Estate Announce North Hyde Park Townhome Project*, Oct. 3, 2015, http://www.1888pressrelease.com/gobea-capital-and-sight-real-estate-announce-north-hyde-park-pr-574546.html.

Compounding's sales representatives.  Dr. Caddick is approximately 38-years-old and,
upon information and belief, resided in Tampa, Florida, at all relevant times described
herein.  In or around 2013, Dr. Caddick formed and/or became a principal at Starman
Consulting, LLC.[3]  Hereinafter, the individual Defendants along with RS Compounding,
Zoe Scripts, and Westchase will collectively be referred to as "Defendants."

## V.     GOVERNING LAWS AND REGULATIONS

### A.  The False Claims Act

37.     Originally enacted in 1863, the FCA was substantially amended in 1986
by the False Claims Amendments Act.  The 1986 amendments enhanced the
Government's ability to recover losses sustained as a result of fraud against the United
States.  Further clarifying amendments were adopted in May 2009 and March 2010.

38.     The FCA imposes liability upon any person who "knowingly presents, or
causes to be presented [to the Government] a false or fraudulent claim for payment or
approval;" or "knowingly makes, uses or causes to be made or used, a false record or
statement material to a false or fraudulent claim;" or "knowingly makes, uses, or causes
to be made or used, a false record or statement material to an obligation to pay or transmit
money or property to the Government, or knowingly conceals or knowingly and
improperly avoids or decreases an obligation to pay or transmit money or property to the
Government."  31 U.S.C. § 3729(a)(1)(A), (B), (G).  Any person found to have violated
these provisions is liable for a civil penalty of up to $11,000 for each such false or
fraudulent claim, plus three times the amount of the damages sustained by the

---

[3] *Starman Consulting, LLC*, Buzzfile.com,  http://www.buzzfile.com/business/Starman-Consulting-LLC-
813-598-2837 (last visited Apr. 6, 2017).

Government.

39.     Significantly, the FCA imposes liability where the conduct is merely "in reckless disregard of the truth or falsity of the information" and further clarifies that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1).

40.     The FCA also broadly defines a "claim" as one that includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A).

41.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to bring an action on behalf of the Government and to share in any recovery.   The complaint must be filed under seal without service on any Defendant.   The complaint remains under seal while the Government conducts an investigation of the allegations in the complaint and determines whether to intervene in the action. 31 U.S.C. § 3730(b).

42.     The request of federal and state reimbursement for the provision of medical services which fails to meet the criteria set forth in federal and state statutes and

regulations constitutes a violation of the FCA.  In this action, Zoe Scripts knowingly and routinely charged artificially inflated prices for its creams and gels in violation of the Medicare program.

**B.  Medicare**

43.     Medicare is a federal government-funded medical assistance program, primarily benefiting the elderly, that was created in 1965 when Congress enacted Title XVIII of the Social Security Act, ("Title XVII"), 42 U.S.C. § 1395 *et seq.*  Medicare is administered by the federal Centers for Medicare and Medicaid Services ("CMS"), which is a division of the U.S. Department of Health and Human Services ("HHS").  Since 2006, Medicare Part D has provided optional prescription-drug coverage to persons eligible for Medicare coverage.

44.     The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") amendment to Title XVIII created the Part D Voluntary Prescription Drug Benefit Program which, as of January 1, 2006, added certain prescription drug benefits, covered by Part D prescription drug plans and employment-based "qualified retiree prescription drug plans," to the benefits covered under Medicare.  *See* 42 U.S.C. §§ 1395w-101, 1395w-132; 42 C.F.R. § 423.882.

45.     Under the MMA, eligible Medicare Part D beneficiaries can obtain prescription drug coverage through private Part D prescription drug plans.  Potential Part D Plan Sponsors, including various pharmacy benefit managers ("PBMs"), submit bids annually to CMS in order to participate in the Part D program.  42 C.F.R. § 423.265.

CMS reviews and approves these bids, and Part D Plan Sponsors then enter into direct contracts with CMS to provide drug benefits to Part D participants.

46.     CMS makes prospective payments to Part D Plan Sponsors based on estimated costs. These include monthly direct subsidy premium payments for each Part D enrollee based on the plan's approved bid amount, reinsurance payments for eighty percent (80%) of the Plan Sponsor's costs for catastrophic coverage for Part D enrollee's above a certain threshold, and low-income subsidy ("LIS") payments for premium and cost-sharing charges for low income individuals. Part D Plans, in turn, provide CMS with documentation of their actual costs.

47.     Following the close of the benefit year, CMS reconciles a Part D Plan Sponsor's actual incurred prescription drug costs against the Plan Sponsor's bid.  If the Plan Sponsor's actual costs exceed estimated costs, the Sponsor may be able to recoup some of its costs through a risk-sharing arrangement with CMS.  If a Part D Plan Sponsor's estimated costs exceed its actual costs, the Sponsor may have to pay back some of the payments made to it by CMS.

48.     Through the MMA's Retiree Drug Subsidy ("RDS") program, CMS contracts with employers or unions offering "qualified retiree prescription drug coverage" to their Medicare-eligible retirees ("RDS Plan Sponsors"), and provides a subsidy for a portion of their retiree drug costs between specified levels.

49.     The RDS subsidy can be claimed for each person enrolled in the employer's plan who would otherwise be enrolled in Medicare Part D.  The subsidy is equal to 28% of "allowable retiree costs," meaning the part of prescription drug costs that

are actually paid by the employer or the retiree, net of any discounts, rebates or similar price concessions. 42 U.S.C. § 1395w−132.

50.     Potential RDS Plan Sponsors must submit an application for each year in which they plan to request a subsidy. Plan Sponsors elect a payment frequency during the application process, and may make as many as twelve interim payment requests per plan year. 42 CFR § 423.888(b)(1).   RDS Plan Sponsors or their representatives, such as PBMs acting on their behalf, must submit cost data to CMS' RDS Center before submitting any interim payment requests.  Those plans which have elected to only receive payments annually must submit cost data at the time of reconciliation. 42 CFR § 423.888(b)(2).

51.     Following the close of the benefit year, CMS reviews the total gross covered retiree prescription drug costs and actual cost adjustments, such as those related to manufacturer price concessions, submitted by the RDS Plan Sponsor after the plan year has ended, and makes a final subsidy payment determination. 42 CFR § 423.888(b)(4). CMS then reconciles the sum of any payments made to the RDS Plan Sponsor with its  final subsidy payment determination, and if the sum of the interim payments made is larger than the final subsidy payment determination, will initiate an overpayment recovery action.

52.     In order to receive a subsidy payment, RDS Plan Sponsors must specifically accept and agree to certain terms, including acknowledging, and requiring all subcontractors to acknowledge, that information being provided in connection with the RDS application or subcontract,  is being used for the purpose of obtaining federal funds.

*See, e.g.*, 42 C.F.R. 423.884(c)(3).

53.     Federal law prohibits a person from knowingly presenting or causing to be presented to Medicare a claim for a medical or other item or service that the person knows or should know was "not provided as claimed," a claim for such items or services that is "false or fraudulent," or a claim that is "for a pattern of medical or other items or services that [the] person knows or should know are not medically necessary."  42 U.S.C. §§ 1320a-7a(a)(1)(A), (B) & (E).  Violation of this section is subject to a civil monetary penalty of $10,000 for each item or service, plus damages measured as three times the amount of each claim submitted, and exclusion from further participation in the programs.

54.     According to the FDA's Compliance Policy Guide for FDA Staff and Industry concerning Pharmacy Compounding:

> when the scope and nature of a pharmacy's activities raise the kinds of concerns normally associated with a drug manufacturer and result in significant violations of the new drug, adulteration, or misbranding provisions of the Act, FDA has determined that it should seriously consider enforcement action.  In determining whether to initiate such action, the Agency will consider whether the pharmacy engages in any of the following acts: 1. Compounding of drugs in anticipation of receiving prescriptions, except in very limited quantities in relation to the amounts of drugs compounded after receiving valid prescriptions … 6. Using commercial scale manufacturing or testing equipment for compounding drug products.

CPG   Sec.   460.200   (Reissued   05/29/2002)   (*available   at* http://www.fda.gov/ICECI/Compliance Manuals/CompliancePolicyGuidanceManual/ucm074398.htm#INTRODUCTION).

**C. The TRICARE Program**

55.     TRICARE, formerly known as CHAMPUS, is a managed health care

program established by the Department of Defense. 10 U.S.C. §§ 1071-1110.  TRICARE

provides health care benefits to eligible beneficiaries, which include, among others,

active duty service members, retired service members, and their dependents.

56.    The regulatory authority establishing the TRICARE program does not

cover drugs not approved by the FDA.  *See* 32 C.F.R. § 199.4(g)(15)(i)(A).  TRICARE

does not cover drugs used for off-label indications unless such off-label use is proven

medically necessary and safe and effective by medical literature, national organizations,

or technology assessment bodies. *See* 32 C.F.R. § 199.4(g)(15)(i)(A)(Note).

### D.  State False Claim Acts

57.    This is also an action to recover double and treble damages and civil

penalties on behalf of the FCA States arising from the conduct of Defendants who: (a)

made, used or presented, or caused to be made, used or presented, certain false or

fraudulent statements, records and/or claims for payment or approval to the FCA States;

and/or (b) made, used or caused to be made or used false records or statements to

conceal, avoid, or decrease an obligation to pay or transmit money to the FCA States, all

in violation of each States' respective false claims act or similar statute.  The false or

fraudulent claims, statements, and records at issue involve payments made by health

insurance programs funded by these State governments, including Medicaid.  The statutes

of the FCA States under which Relator brings these related claims are:

> a.  California False Claims Act, Cal. Govt. Code §§ 12650, *et seq*.;
> b.  Colorado Medicaid False Claims Act, Colo. Stat. Ann. §§ 25.5-4-303.5, *et seq*.;
> c.  Delaware False Claims and Reporting Act, Del Code Ann. tit. 6, §§ 1201, *et seq*.;
> d.  Florida False Claims Act, Fla. Stat. Ann. §§ 68.081, *et seq*.;

e.  Georgia False Medicaid Claims Act, Ga. Code. Ann. §§ 49-4-168.1, *et seq.*;

f.  Georgia Taxpayer Protection False Claims Act – Ga. Code Ann. §§ 23-3-120, *et seq.*;

g.  Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1, *et seq.*;

h.  Indiana False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.5-1, *et seq.*;

i.  Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7, *et seq.*;

j.  Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §§ 46:439.1, *et seq.*;

k.  Massachusetts False Claims Law, Mass. Gen. Laws ch. 12, §§ 5A, *et seq.*;

l.  Maryland False Health Claims Act, Md. Code Ann. Health-Gen. §§ 2-601, *et seq.*;

m.  Maryland False Claims Act, Md. Code Ann. Gen §§ 8-101, *et seq.*;

n.  Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. §§ 357.010, *et seq.*;

o.  New Jersey False Claims Act, N.J.S.A. §§ 2A:32C-1, *et seq.*;

p.  New Jersey Medical Assistance & Health Services, Act, N.J.S.A. 30:4D-1, *et se*q.;

q.  New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1, *et seq.*;

r.  New Mexico Fraud Against Tax Payers Act, N.M. Stat. Ann. §§ 44-9-1, *et seq.*;

s.  Oklahoma Medicaid False Claims Act, 63 Okla. St. Ann. §§ 5053, *et seq.*;

t.  Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*;

u.  Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101, *et seq.*;

v.  Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*; and

w.  Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1, *et seq.*

**E.  The California & Illinois Insurance Fraud Prevention Acts**

58.     While the federal and state FCA statutes protect *public* insurance entities from fraud, California and Illinois are unique in permitting whistleblowers to bring a *qui tam* action against any person or company that defrauds private insurance companies and share in the recovery.  *See* California Insurance Frauds Prevention Act ("CIPFA"), Cal. Ins. Code §§ 1871**,** *et seq*., and the Illinois Claims Fraud Prevention Act ("ICFPA"), 740

I.L.C.S. §§ 92/1, *et seq.*

59.     Rather than bringing the case on behalf of the government and fellow taxpayers, a CIPFA or IICFPA relator brings the case on behalf of the government *and* the relevant private insurance companies' policyholders.

## VI.     SPECIFIC ALLEGATIONS

60.     Defendants employ approximately 150 sales representatives nationwide.

61.     Defendants manufacture creams and gels on an industrial scale similar to large pharmaceutical companies.  Defendants create these creams and gels in anticipation of receiving prescriptions.

62.     Defendants market their products by providing physicians with pre-printed script pads that list the creams and gels.  The following is a copy of a pre-printed script:

63.     Pursuant to Mr. Gobea's and Dr. Caddick's directives, Defendants instructed their sales representatives to write in the physician's name and address, and the number "6" on each refill line.

64.     Relator recalls receiving complaints from the physicians she worked with that some of their patients were angered by RS Compounding's automatic shipments of the six compounds and their billing for _each_ compound, even though there was no medical need for the additional five compounds and the patient did not want the extra compounds.   One patient in particular had voiced her frustration and anger with her physician, who relayed same to Relator, after the patient received six scar creams from one initial prescription, at a cost of several thousand dollars per cream.

65.      Sales representatives also "coach" physicians to use Defendants' "1, 2, 3 strategy," created by Mr. Gobea and/or Dr. Caddick.

66.     Mr. Taylor (RS Compounding's V.P. of Marketing & Sales), described Defendants' "1, 2, 3 strategy," in an email dated November 27, 2012, as follows:

> Frustrated with unfilled scripts? Try a 1, 2, 3 strategy with your physicians.
>
> As you know your docs have the option of ranking their preference on the script pad.  Coach them to a 1, 2, 3 strategy.
>
> 1. NeuroMax – If not covered, then Option 2
> 2. NeuroFlex – If not covered patients receive 120g @ $35.
> 3. NeuroGel – Covered by most Medicare Part D plans and if not patients receive 120g @ $35. Also some of these are paying above $100 so you will receive sales credit.

67.     Under Defendants' "1, 2, 3 strategy," physicians are coached to choose their top three preferences for each cream or gel based on the active ingredients.

68.     Under this marketing scheme, Defendants instruct sales representatives to "coach" physicians to write number "1" next to either  NeuroMax, NeuroPlus-0 or KetaLIGHT.   Each of these creams contain ketamine, which provides the highest reimbursement rate.  Ketamine is a Schedule III controlled substance.  If ketamine is not covered, then none of these three drugs will be covered.

69.     To ensure coverage of prescription, Defendants instruct sales representatives to "coach" physicians to write a number "2" next to either NeuroFlex or FlexUltra.   NeuroFlex and FlexUltra do not contain ketamine.   NeuroFlex contains gabapentin, and FlexUltra contains baclofen.  These two creams have the second-highest reimbursement rates of Defendants' drugs, if they are covered.

70.     Finally, Defendants instruct sales representatives to "coach" physicians to write a "3" next to NeuroGel, which has the lowest reimbursement rate of Defendants' drugs.

71.     Through this marketing scheme, Defendants also targeted geographical locations with high concentrations of military personnel in order to issue large quantities of compounding prescriptions to the men and women of the armed services knowing that TRICARE would reimburse the highly inflated costs.

72.     Overall, Defendants submit claims for reimbursement to Medicare Part D plans, TRICARE, Medicaid and private insurers for amounts that grossly exceed the actual value of their products.    The true value of Defendants' creams and gels is substantially less than the amounts it bills to TRICARE, Medicare, Medicaid, and private insurers.

73.     Mr. Gobea and Dr. Caddick have knowingly participated in determining the disparate amounts charged for RS Compounding's products and, as such, the amounts for which Defendants submit claims to the Government.  They have also knowingly caused fraudulent claims to be submitted to TRICARE, Medicare, Medicaid, and private insurers.

74.     In or around late 2012/early 2013, Relator began receiving complaints from physicians who had prescribed the Company's compounds for patients and who, in turn, learned from their patients that some of the compounds had cost several thousand dollars.

75.     It had been RS Compounding's policy to not disclose to its sales representatives the actual prices it charged for the compounds.

76.     Around this same time, Relator learned that another sales representative had been receiving similar complaints from the physicians he had accounts with.  Shortly thereafter, that sales representative accessed the Company's computer records and noticed the disparate pricing scheme that the Company was using.  That is, the Company charged vastly different prices for individuals who were uninsured, who had private insurance, and who were covered by TRICARE, Medicare, and Medicaid.

77.     He also possessed documentation that when RS Compounding received a complaint from a patient about expensive copays, one of the Company's representatives would contact the "patient to offer [the] cash price."

78.     Having become irate with what he had observed, the sales representative brought this information to his superiors' attention, including Mr. Taylor (V.P. of Sales &

Marketing).

79.     Relator also notified Mr. Taylor about the complaints she had been receiving from physicians about the inordinate price differential for compounds charged to TRICARE, Medicare, and Medicaid.

80.     In response to both the sales representative's and Relator's complaints, Mr. Taylor instructed them to not question it because prices were set "at the top of the Company," thereby directly implicating RS Compounding's owners Mr. Gobea and/or Dr. Caddick.

81.     Defendants sell 120-gram bottles of their creams and gels to uninsured patients for anywhere from $15.00 to $45.00.

82.     Relator is informed and believes that she initially (in or around 2012) received commissions ranging from $50 to $100 on Medicare Part D reimbursements, which represents approximately 10% of the sale amount.

83.     In or around 2013, after Relator and the other sales representative brought the disparate pricing complaints to their superiors, RS Compounding increased the commissions to $150 and then to $200 per compound.  However, the $100 to $200 commissions applied only to compounds that contained ketamine.  Relator subsequently learned that RS Compounding incentivized its sales representatives to sell ketamine-containing compounds because it would charge TRICARE, Medicare, Medicaid and private insurers thousands of dollars for each of those compounds.

84.     Based upon her experience while employed by RS Compounding, Relator believes that Defendants have submitted, and continue to submit claims for Medicare

reimbursements for at least $500.00 per bottle of the creams and gels Defendants sell to uninsured patients for $35.00, as well as claims for TRICARE and Medicaid.

85.     In fact, in order to boost sales revenues, Defendants told their sales representatives to focus their marketing on Medicare patients.  Mr. Taylor (V.P. of Marketing) emailed sales representatives on March 2, 2013 as follows:

> Medicare Formulas! The Gel formulations are often covered by Medicare Part D which means potential sales credit for you. We are adding a FlexGel formula to go with the NeuroGel formula. This provide[s] a more neuropathic and inflammatory choice for these patients. Additionally these formulas are set apart on the prescription pad to remind the physician of the [Medicare Part D] insurance coverage.

86.     By targeting patients with Medicare Part D coverage and then seeking reimbursements at inflated prices for drugs by concealing the true value of its creams and gels, Defendants continue to violate the FCA.  Defendants Mr. Gobea and Dr. Caddick knowingly caused RS Compounding to adhere to this fraudulent practice.

87.     In addition, Defendants promote these compounds to treat serious medical conditions.

88.     Defendants claim that its creams and gels treat, among many symptoms, the following medical conditions: peripheral neuropathy; carpal tunnel syndrome; chemo induced neuropathy; diabetic neuropathy; phantom limb pain; fibromyalgia; sciatica; tendonitis; plantar fasciitis; and arthritis.

89.     Defendants, however, do not train their sales representatives regarding proper and improper use, or potential contra-indications or warnings.  Defendants did not offer or provide Relator with any formal training or educate her or any sales

representatives about the efficacy or proper use of their products while she was employed.

90. Defendants also do not sufficiently inform patients about the proper use of their compounds for these medical conditions. Defendants provide physicians with the following basic instructions that are part of the pre-printed script pads:



91. These ten instructions do not provide specific information about Defendants' differing compounds, and appear on promotional materials rather than in a package insert. Defendants do not provide patients with additional instructions or precautions.

92. Despite the fact that Defendants do not provide sufficient warnings to patients, especially about the effects of Ketamine, Defendants, at Mr. Gobea's and Dr.

Caddick's urging, nevertheless have encouraged and continue to encourage sales representatives to visit OBGYNs to promote their creams and gels. In fact, sales representatives facilitate providing samples to OBGYNs and other physicians.

93. Defendants encourage sales representatives to fill out requests for samples of these pre-made compounds on behalf of physicians while visiting their offices. Sales representatives are instructed to fax these requests, which are labeled by sales representatives as "for office use," to Defendants from the physician's office.

94. Defendants Mr. Gobea and Dr. Caddick knowingly caused RS Compounding representatives to present the above false claims to Government health care programs and private insurers and make false records and statements material to such claims, by devising the fraudulent practices and instructing their employees to put them into effect.

95. Under the FCA and its state-level equivalents, claims for Defendants' creams and gels have been and continue to be fraudulent because the claims submitted for reimbursement are based upon illegal marketing. If government-funded and private health insurance programs had been aware that Defendants' drugs were prescribed as a result of the conduct alleged in this Complaint, they would not have paid the claims submitted as a result of Defendants' wrongdoing.

## VII. CLAIMS FOR RELIEF

### FIRST CLAIM

#### (False Claims Act: Presentation of False Claims – 31 U.S.C. § 3729(a)(1)(A))

96. Relator repeats and re-alleges the allegations contained in the above

paragraphs of this complaint as if fully set forth herein.

97.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

98.     As a result, the Government has suffered damages in the form of millions of dollars in unearned TRICARE, Medicare, and Medicaid payments made to Defendants.

## SECOND CLAIM

### (False Claims Act: Making or Using a False Record of Statement to Cause a Claim to be Paid – 31 U.S.C. § 3729(a)(1)(B))

99.     Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

100.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have knowingly made, used, or caused to be made or used, false record or statements (*i.e.*, the false certifications and representations made or caused to be made by   RS Compounding) material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

101.     As a result, the Government has suffered damages in the form of millions of dollars in unearned TRICARE, Medicare, and Medicaid payments made to Defendants.

## THIRD CLAIM

### (False Claims Act: Making or Using a False Record of Statement to Avoid an Obligation to Refund– 31 U.S.C. § 3729(a)(1)(G))

102.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

103.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have knowingly made, used, or caused to be made or used, false records or false statements (*i.e.*, the false certification made or caused to be made by Defendants) material to an obligation to pay or transmit money to the Government or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government.

104.    As a result, the Government has suffered damages in the form of millions of dollars in unearned TRICARE, Medicare, and Medicaid payments made to Defendants.

## FOURTH CLAIM

### (False Claims Act: Conspiracy – 31 U.S.C. § 3729(a)(1)(C))

105.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

106.    As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, Defendants have conspired to make or present false or fraudulent claims and performed one or more acts to effect payment of false or fraudulent claims.

107.    As a result, the Government has suffered damages in the form of millions of dollars in unearned TRICARE, Medicare, and Medicaid payments made to

Defendants.

## FIFTH CLAIM

### (Florida False Claims Act: Fla. Stat. Ann. §§ 68.081, *et seq.*)

108.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

109.    This is a claim for treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081, *et seq.*

110.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

111.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

112.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

113.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

114.    As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Florida Medicaid Program identified

herein.

## SIXTH CLAIM

### (California False Claims Act – Cal. Gov't Code §§ 12650, *et seq.*)

115.     Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

116.     This is a claim for treble damages and civil penalties under the California False Claims Act, Cal Gov't Code §§ 12650, *et seq.*

117.     As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the California Medicaid (i.e., Medi-Cal) and F.A.M.I.S.[4] programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

118.     The California Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

119.     By reason of these payments, the California Medicaid Program has been damaged and continues to be damaged in a substantial amount.

120.     As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the California Medicaid Program identified herein.

---

[4] F.A.M.I.S. is an acronym for Family Access to Medical Insurance Security, a federal program to assist families with healthcare expenses not covered by Medicaid.

**SEVENTH CLAIM**

**(California Insurance Fraud Prevention Act - Cal Ins. Code §§ 1871.7, *et seq.*)**

121.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

122.    This is a claim for treble damages and penalties under the CIFPA.

123.    By virtue of the acts described above, Defendants knowingly utilized a scheme by which they presented, or caused to be presented, false or fraudulent claims to private insurers in California, or for patients in California those insurers covered–patients who hold private insurance contracts and against whom Defendants could file claims for payment or approval in violation of each patient's private health insurance contract.

124.    By virtue of the acts described above, Defendants conspired to violate the CIFPA and each patient's private health insurance contract.

125.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

126.    Each claim for reimbursement that was a result of Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

127.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the private insurers in California, or

for patients in California those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

128. The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

129. Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their obligation to return overpayments to these private insurance companies.

130. By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## EIGHTH CLAIM

### (Colorado Medicaid False Claims Act, Colo. Stat. Ann. §§ 25.5-4-303.5, *et seq.*)

131. Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

132. This is a claim for treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colo. Stat. Ann. §§ 25.5-4-303.5, *et seq.*

133. As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Colorado Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish

this purpose.

134.    The Colorado Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

135.    By reason of these payments, the Colorado Medicaid Program has been damaged and continues to be damaged in a substantial amount.

136.    As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Colorado Medicaid Program identified herein.

## NINTH CLAIM

**(Delaware False Claims and Reporting Act – Del. Code Ann. Tit. 6, §§ 1201, *et seq.*)**

137.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

138.    This is a claim for treble damages and civil penalties under the Delaware False Claims and Reporting Act – Del. Code Ann. Tit. 6, §§ 1201, *et seq.*

139.    As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Delaware Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

140.    The Delaware Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have

been allowed.

141.   By reason of these payments, the Delaware Medicaid Program has been damaged and continues to be damaged in a substantial amount.

142.   As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Delaware Medicaid Program identified herein.

## TENTH CLAIM

**(Georgia Taxpayer Protection False Claims Act – Ga. Code Ann. §§ 23-3-120, *et seq.*, and the Georgia False Medicaid Claims Act, Ga. Code. Ann. §§ 49-4-168.1, *et seq.*)**

143.   Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

144.   This is a claim for treble damages and civil penalties under the Georgia Taxpayer Protection False Claims Act – Ga. Code Ann. §§ 23-3-120, *et seq.*, and the Georgia False Medicaid Claims Act, Ga. Code. Ann. §§ 49-4-168.1, *et seq.*

145.   As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Georgia Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

146.   The Georgia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

147.    By reason of these payments, the Georgia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

148.    As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Georgia Medicaid Program identified herein.

## ELEVENTH CLAIM

### (Illinois False Claims Act – 740 Ill. Comp. Stat. §§ 175/1, *et seq.*)

149.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

150.    This is a claim for treble damages and civil penalties under the Illinois False Claims Act – 740 Ill. Comp. Stat. §§ 175/1, *et seq.*

151.    As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Illinois Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

152.    The Illinois Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

153.    By reason of these payments, the Illinois Medicaid Program has been damaged and continues to be damaged in a substantial amount.

154.    As a result, Defendants' conduct was the proximate and actual cause of

several million dollars in losses and damages to the Illinois Medicaid Program identified herein.

## TWELFTH CLAIM

**(Illinois Insurance Claims Fraud Prevention Act - 740 Ill.
Comp. Stat.  §§ 92/1, *et seq.*)**

155.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

156.    This is a claim for treble damages and penalties under the IICFPA.

157.    By virtue of the acts described above, Defendants knowingly utilized a scheme by which it presented, or caused to be presented, false or fraudulent claims to private insurers in Illinois, or for patients in Illinois those insurers covered–patients who hold private insurance contracts and against whom Defendants could file claims for payment or approval–in violation of each patient's private health insurance contract.

158.    By virtue of the acts described above, Defendants conspired to violate the IICFPA and each patient's private health insurance contract.

159.    By virtue of the acts described above, Defendants knowingly made, used or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

160.    Each claim for reimbursement that was a result of Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

161.    By virtue of the acts described above, Defendants knowingly presented or

caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

162.    The private insurers in Illinois, or those insurers that covered patients in Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

163.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their obligation to return overpayments to these private insurance companies.

164.    By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## THIRTEENTH CLAIM

**(Indiana False Claims and Whistleblower Protection Act – Ind. Code Ann. §§ 5-11-5.5-1, *et seq.* and the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7, *et seq.*)**

165.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

166.    This is a claim for treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act – Ind. Code Ann. §§ 5-11-5.5-1, *et seq.* and the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7, *et seq.*

167.     As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Indiana Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

168.     The Indiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

169.     By reason of these payments, the Indiana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

170.     As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Indiana Medicaid Program identified herein.

## FOURTEENTH CLAIM

### (Louisiana Medical Assistance Programs Integrity Law – La. Rev. Stat. Ann. §§ 46:437.1, *et seq.*)

171.     Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

172.     This is a claim for treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law – La. Rev. Stat. Ann. §§ 46:437.1, *et seq.*

173.     As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Louisiana Medicaid and F.A.M.I.S. programs false claims

to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

174.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

175.    By reason of these payments, the Louisiana Medicaid Program has been damaged and continues to be damaged in a substantial amount.

176.    As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Louisiana Medicaid Program identified herein.

## FIFTEENTH CLAIM

**(Maryland False Claims Health Act – Md. Health-Gen. Code Ann. §§ 2-601, *et seq.*, and Maryland False Claims Act, Md. Code Ann. Gen §§ 8-101, *et seq.*)**

177.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

178.    This is a claim for treble damages and civil penalties under the Maryland False Claims Health Act – Md. Health-Gen. Code Ann. §§ 2-601, *et seq.*, and Maryland False Claims Act, Md. Gen. Code Ann. §§ 8-101, *et seq.*

179.    As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Maryland Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

180.     The Maryland Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

181.     By reason of these payments, the Maryland Medicaid Program has been damaged and continues to be damaged in a substantial amount.

182.     As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Maryland Medicaid Program identified herein.

## SIXTEENTH CLAIM

**(Massachusetts False Claims Act – Mass. Ann. Laws ch. 12, §§ 5(A), *et seq.*)**

183.     Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

184.     This is a claim for treble damages and civil penalties under the Massachusetts False Claims Act – Mass. Ann. Laws ch. 12, §§ 5(A), *et seq.*

185.     As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Massachusetts Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

186.     The Massachusetts Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

187.     By reason of these payments, the Massachusetts Medicaid Program has been damaged and continues to be damaged in a substantial amount.

188.     As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Massachusetts Medicaid Program identified herein.

## SEVENTEENTH CLAIM

### (Nevada Submission of False Claims to State or Local Government Act – Nev. Stat. §§ 357.010, *et seq.*)

189.     Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

190.     This is a claim for treble damages and civil penalties under the Nevada Submission of False Claims to State or Local Government Act – Nev. Stat. §§ 357.010, *et seq.*

191.     As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Nevada Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

192.     The Nevada Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

193.     By reason of these payments, the Nevada Medicaid Program has been damaged and continues to be damaged in a substantial amount.

194.     As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Nevada Medicaid Program identified herein.

## EIGHTEENTH CLAIM

**(New Jersey False Claims Act – N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*, and the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1, *et seq.*)**

195.     Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

196.     This is a claim for treble damages and civil penalties under the New Jersey False Claims Act – N.J. Stat. Ann. §§ 2A:32C-1, *et seq.*, and the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1, *et seq.*

197.     As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the New Jersey Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

198.     The New Jersey Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

199.     By reason of these payments, the New Jersey Medicaid Program has been damaged and continues to be damaged in a substantial amount.

200.     As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the New Jersey Medicaid Program

identified herein.

## NINETEENTH CLAIM

**(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1, *et seq.*, and New Mexico Fraud Against Tax Payers Act, N.M. Stat. Ann. §§ 44-9-1, *et seq.*)**

201.   Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

202.   This is a claim for treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. §§ 27-14-1, *et seq.*, and New Mexico Fraud Against Tax Payers Act, N.M. Stat. Ann. §§ 44-9-1, *et seq.*

203.   As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the New Mexico Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

204.   The New Mexico Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

205.   By reason of these payments, the New Mexico Medicaid Program has been damaged and continues to be damaged in a substantial amount.

206.   As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the New Mexico Medicaid Program identified herein.

**TWENTIETH CLAIM**

**(Oklahoma Medicaid False Claims Act – Okla. Stat. Tit. 63, §§ 5053.1, *et seq.*)**

207.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

208.    This is a claim for treble damages and civil penalties under the Oklahoma Medicaid False Claims Act – Okla. Stat. Tit. 63, §§ 5053.1, *et seq.*

209.    As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Oklahoma Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

210.    The Oklahoma Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

211.    By reason of these payments, the Oklahoma Medicaid Program has been damaged and continues to be damaged in a substantial amount.

212.    As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Oklahoma Medicaid Program identified herein.

**TWENTY-FIRST CLAIM**

**(Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*, and
Tennessee False Claims Act, Tenn. Code Ann. §§ 4-18-101, *et seq.*)**

213.    Relator repeats and re-alleges the allegations contained in the above

paragraphs of this complaint as if fully set forth herein.

214.     This is a claim for treble damages and civil penalties under the Tennessee False Claims Act – Tenn. Code Ann. §§ 4-18-101, *et seq.*, and Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181, *et seq.*

215.     As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Tennessee Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

216.     The Tennessee Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

217.     By reason of these payments, the Tennessee Medicaid Program has been damaged and continues to be damaged in a substantial amount.

218.     As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Tennessee Medicaid Program identified herein.

## TWENTY-SECOND CLAIM

### (Texas Medicaid Fraud Prevention Act – Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*)

219.     Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

220.    This is a claim for statutory damages and civil penalties under the Texas Medicaid Fraud Prevention Act – Tex. Hum. Res. Code Ann. §§ 36.001, *et seq.*

221.    As more particularly set forth in the foregoing paragraphs, by virtue of the false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Texas Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

222.    The Texas Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

223.    By reason of these payments, the Texas Medicaid Program has been damaged and continues to be damaged in a substantial amount.

224.    As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Texas Medicaid Program identified herein.

## TWENTY-THIRD CLAIM

**(Virginia Fraud Against Taxpayers Act – Va. Code Ann. §§ 8.01-216.1, *et seq.*)**

225.    Relator repeats and re-alleges the allegations contained in the above paragraphs of this complaint as if fully set forth herein.

226.    This is a claim for treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act – Va. Code Ann. §§ 8.01-216.1, *et seq.*

227.    As more particularly set forth in the foregoing paragraphs, by virtue of the

false representations, claims and submissions described above, Defendants knowingly caused to be presented to the Virginia Medicaid and F.A.M.I.S. programs false claims to obtain improper payment for treatment and used false or fraudulent records to accomplish this purpose.

228.    The Virginia Medicaid Program, unaware of the falsity or fraudulent nature of the claims caused by Defendants, paid for claims that otherwise would not have been allowed.

229.    By reason of these payments, the Virginia Medicaid Program has been damaged and continues to be damaged in a substantial amount.

230.    As a result, Defendants' conduct was the proximate and actual cause of several million dollars in losses and damages to the Virginia Medicaid Program identified herein.

## VIII.        PRAYER FOR RELIEF

**WHEREFORE,** Relator, on behalf of the United States Government demands judgment against Defendants ordering that:

a.        Pursuant to 31 U.S.C. § 3729(a), Defendants pay an amount equal to three times the amount of damages the United States Government sustained because of Defendants' actions which Relator currently estimates to be millions of dollars, plus civil penalties of not less than $10,781 and not more than $21,563 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*.;

b.        Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the False Claims Act and/or any other applicable provision of law;

c.      Relator be awarded all costs and expenses of this action, including attorneys' fees and costs as provided by 31 U.S.C. § 3730(d) and any other applicable provision of law; and

d.      Relator be awarded such other and further relief as the Court may deem to be just and proper.

**AND FURTHERMORE**, Relator, on behalf of the governments of the FCA States, demands judgment against Defendants ordering that Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each FCA State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within each FCA State, all as provided by:

     i.    Cal. Gov't Code § 12650;

    ii.    Cal. Ins. Code § 1871.7(b);

    iii.    Colo. Stat. Ann. § 25.5-4-304;

    iv.    6 Del. C. § 1201;

    v.    Fla. Stat. Ann. § 68.082;

    vi.    Ga. Code. Ann. § 49-4-168.1 and § 23-3-121;

    vii.    740 Ill. Comp. Stat. Ann. § 175/3;

    viii.    740 Ill. Comp. Stat. § 92/5(b);

    ix.    Ind. Code § 5-11-5.5-2 and § 5-11-5.7-2;

    x.    La. Rev. Stat. § 46:438.6;

    xi.    MD. Code Ann. Gen. Prov. § 8-101, *et seq.;*

       xii.    MD. Code. Ann. Health-Gen. § 2-601, *et seq.*;

      xiii.    Mass. Gen. Laws Ch. 12 § 5B;

      xiv.    Nev. Rev. Stat. Ann. § 357.040;

       xv.    N.J.S.A. 2A:32C-3;

      xvi.    N.M. Stat. Ann. § 27-14-4 and §§ 44-9-3;

     xvii.    63 Okla. St. Ann. § 5053.1;

    xviii.    Tenn. Code Ann. § 71-5-182 and 4-18-103; and

      xix.    Va. Code Ann. § 8.01-216.3.

      a.    Relator be awarded such other and further relief as the Court may deem to be just and proper.

      b.    Relator and Plaintiff State of Texas be awarded statutory damages in an amount equal to two times the amount of actual damages that Texas has sustained as a result of Defendants' actions within Texas, as well as the maximum statutory civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.052;

      c.    Relator be awarded her relator's share of any judgment to the maximum amount provided pursuant to:

        i.    Cal. Gov't Code § 12651(g)(2);

       ii.    Cal. Ins. Code § 1871.7;

      iii.    Colo. Stat. Ann. § 25.5-4-306;

      iv.    6 Del. C. § 1205;

       v.    Fla. Stat. Ann. § 68.085;

      vi.    Ga. Code. Ann. § 49-4-168.2(i);

       vii.     740 Ill. Comp. Stat. Ann. § 175/4(d);

      viii.     740 Ill. Comp. Stat. Ann. § 92/25;

       ix.     Ind. Code § 5-11-5.5-6 and § 5-11-5.7-6;

       x.     La. Rev. Stat. § 46:439.4;

       xi.     MD. Code Ann. Gen. Prov. § 8-101, *et seq.*;

      xii.     MD. Code. Ann. Health-Gen. § 2-601, *et seq.*;

     xiii.     Mass. Gen. Laws Ch. 12 § 5F;

     xiv.     Nev. Rev. Stat. Ann. § 357.210;

      xv.     N.J.S.A. 2A:32C-7;

     xvi.     N.M. Stat. Ann. § 27-14-9 and § 44-9-7;

    xvii.     63 Okla. St. Ann. § 5053.4;

   xviii.     Tenn. Code Ann. § 71-5-183 and § 4-18-104;

     xix.     Tex. Hum. Res. Code Ann. § 36.110; and

      xx.     Va. Code Ann. § 8.01-216.7.

    d.     Relator be awarded all costs and expenses associated with each of the pendent State FCA and insurance fraud claims, plus attorneys' fees as provided pursuant to:

       i.     Cal. Gov't Code § 12651(g)(8);

      ii.     Cal. Ins. Code § 1871.7;

     iii.     Colo. Stat. Ann. § 25.5-4-306;

     iv.     6 Del. C. § 1205;

      v.     Fla. Stat. Ann. § 68.086;

      vi.      Ga. Code. Ann. § 49-4-168.2(i);

     vii.      740 Ill. Comp. Stat. Ann. § 175/4(d);

    viii.      740 Ill. Comp. Stat. Ann. § 92/25;

      ix.      Ind. Code § 5-11-5.5-6 and § 5-11-5.7-6;

       x.      La. Rev. Stat. § 46:439.4;

      xi.      MD. Code Ann. Gen. Prov. § 8-101, *et seq.*;

     xii.      MD. Code. Ann. Health-Gen. § 2-601, *et seq.*;

    xiii.      Mass. Gen. Laws Ch. 12 § 5F;

    xiv.      Nev. Rev. Stat. Ann. § 357.180;

     xv.      N.J.S.A. 2A:32C-8;

    xvi.      N.M. Stat. Ann. § 27-14-9 and § 44-9-7;

    xvii.      63 Okla. St. Ann. § 5053.4;

   xviii.      Tenn. Code Ann. § 71-5-183 and § 4-18-104;

    xix.      Tex. Hum. Res. Code Ann. § 36.110; and

     xx.      Va. Code Ann. § 8.01-216.7.

      e.     Defendants cease and desist from further violations of the FCA, the various state FCAs as set forth above, the CIFPA, and the IICFPA;

      f.     Relator and FCA State Plaintiffs be awarded pre- and post-judgment interest on the awards ordered herein; and

      g.     Relator and FCA State Plaintiffs be awarded such further relief as the Court deems appropriate and just.

**TRIAL BY JURY**

Relator hereby demands a trial by jury as to all issues.

Dated:  July 12, 2017                    By:  */s/ Robert A. Magnanini*
                                              Robert A. Magnanini
                                              STONE & MAGNANINI LLP
                                              100 Connell Drive, Suite 2200
                                              Berkeley Heights, New Jersey 07922
                                              Tel: (973) 218-1111
                                              Fax: (973) 218-1106
                                              rmagnanini@stonemagnalaw.com

                                         By:  */s/ G. Wrede Kirkpatrick*
                                              G. Wrede Kirkpatrick
                                              Florida Bar No. 0984116
                                              Hines Norman Hines, P.L.
                                              315 S. Hyde Park Avenue
                                              Tampa, Florida 33606
                                              Tel: (813) 251-8659
                                              Fax: (813) 254-6153
                                              wkirkpatrick@hnh-law.com

                                              *Attorneys for Plaintiff/Relator*
                                              *McKenzie Stepe*