**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF VIRGINIA, the COMMONWEALTH OF MASSACHUSETTS, and the States of CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, NEVADA, NEW JERSEY, NEW MEXICO, OKLAHOMA, TENNESSEE, TEXAS, and the policyholders of XYZ Nos. 1-10 Insurance Companies, | ) ) ) ) ) ) ) ) ) ) |
| | ) Case No. 8:13-cv-3150-T-33AEP |
| *ex rel.*, MCKENZIE STEPE, | ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| RS COMPOUNDING LLC d/b/a ZOE SCRIPTS LABORATORY SERVICES, LLC, and d/b/a WESTCHASE COMPOUNDING PHARMACY, RENIER GOBEA, STEPHEN M. CADDICK, Pharm.D., and JOHN DOE CORPORATIONS 1-10, all whose true names are unknown, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFF/RELATOR'S OPPOSITION TO MOTION TO DISMISS**
**AMENDED COMPLAINT**

Plaintiff/Relator, McKenzie Stepe ("Relator"), by and through undersigned counsel, hereby opposes Defendants RS COMPOUNDING's and RENIER GOBEA's Motion to Dismiss Relator's Amended Complaint and as grounds therefore states as follows:

**PRELIMINARY STATEMENT**

Over a period of several years, Defendants RS Compounding LLC (a pharmacy, hereinafter "RS Compounding" or the "Company") and its owner Renier Gobea (collectively,

"Defendants"), along with co-Defendant Stephen Caddick, Pharm.D.,[1] defrauded the federal and state governments (the "Government") by charging Government health care programs, in some instances, $3,000 for the same medicinal compound they charged uninsured cash buyers $45 for, in violation of the False Claims Act ("FCA") and its state analogues. That is a 6,567% difference between the price Defendants routinely charged the Government for some of their compounds as opposed to cash buyers.  Mr. Gobea, as RS Compounding's owner and principal, directed RS Compounding's sales representatives to implement fraudulent schemes, including disparate pricing, coaching physicians to prescribe high reimbursement rate compounds, providing pre-printed prescription/script pads with upwards of six automatic refills, and encouraging the promotion and sale of compounds with insufficient warnings and inadequate training for sales staff. In so doing, Defendants targeted, among others, the TRICARE program, helping to nearly bankrupt our armed forces' healthcare budget in the process.

Defendants move to dismiss Relator's First Amended Complaint ("Complaint"), making sweeping, unsupported arguments that, if adopted, would significantly hinder the Government's ability to prosecute pharmaceutical companies under the FCA. Defendants urge the Court to ignore Relator's detailed description of Defendants' fraudulent schemes and intentional violations of the FCA because Relator was, in their words, not in a position within RS Compounding to state specifically who submitted claims for payment to the Government and when. Defendants take the extraordinary position that a sales representative, like Relator, cannot satisfy Rule 9(b)'s pleading requirements because she lacks direct, first-hand

---

[1] In this opposition, Relator's argument focuses on her allegations against the movants, with only limited mention of Dr. Caddick.  No waiver is intended or made as to Relator's allegations against Dr. Caddick.

knowledge of submissions of claims to federal health care programs. Defendants' assertions are belied by the fact that the Government has partially intervened in this matter, despite knowing that Relator was a sales representative. Also, Defendants ignore not only the fact that numerous successful FCA cases in the health care sector have been brought by sales representatives, and that sales representatives are often the people in the best position to know the company's sales strategies and what takes place at the physician/patient level. *See, e.g.,* *U.S. ex rel. Alcaine v. Braden Partners, L.P., dba Pacific Pulmonary Services*, No. 10-cv-4597 (N.D. Cal. settled 2017) (defendant to pay $11.4 million); *U.S. ex rel. Brown v. Celgene Corp.*, No. 2:10-cv-03165 (C.D. Cal. settled 2017) (defendant to pay $280 million); *U.S. ex rel. Smith v. Astellas Pharma US Inc.*, No. 2:10-cv-00999 (E.D. Pa. settled 2014) (defendant to pay $7.3 million).

Perhaps more importantly, Defendants do not deny their conduct alleged in the Complaint. This is a straight forward FCA case: Mr. Gobea and his company, RS Compounding, produced a series of six compounds, made from different mixtures of the same ingredients, and violated the FCA in numerous ways, while defrauding the Government of millions of dollars. The Department of Justice has intervened in part in Relator's Complaint and Relator is pursuing part of the Complaint on behalf of the Government to recover approximately $60 million Defendants have wrongfully stolen from the Government.

## STATEMENT OF FACTS

RS Compounding, also doing business as Westchase Compounding Pharmacy and Zoe Scripts, is a compounding pharmacy based in Tampa, Florida, which manufactures compounding creams and gels on an industrial scale with approximately 150 sales

representatives worldwide.  (Compl. at ¶¶ 30, 60-61).  Mr. Gobea, who is not a licensed pharmacist, co-founded RS Compounding with Dr. Caddick in 2004.  Sometime thereafter, Mr. Gobea sold his interest to Dr. Caddick. (*Id.* at ¶ 35). In or around February 2014, however, Mr. Gobea returned to RS Compounding after purchasing Dr. Caddick's interest for several million dollars, while Dr. Caddick remained as a manager. (*Id.*). As of the filing of the Complaint, Mr. Gobea remains the owner and director of RS Compounding. (*Id.*). Mr. Gobea oversees all of RS Compounding's operations, including coordinating the training of the Company's sales representatives. (*Id.*). Defendants hired Relator in November 2011 as a sales representative in a territory that included New Jersey and New York.  (*Id.* at ¶ 30).  She held that position until she left the Company in February 2013.  (*Id.*).

### A.    Defendants' Compound Gels and Creams.

Unlike traditional compounding pharmacies that combine specific pharmaceuticals based on a doctor's unique request for an individual patient, RS Compounding manufactures and distributes massive quantities of pre-made compounds throughout the country.  (*Id.* at ¶ 7).  The following are among the primary compounds that Defendants market and distribute:

    a.     NeuroMax, which contains **15% ketamine**, 6% gabapentin, 0.2% clonidine, 7% prilocaine, 3% baclofen, and 2% diclofenac;

    b.     NeuroPlus-O, which contains **10% ketamine**, 2% cyclobenzaprine, 3% diclofenac, 6% gabapentin, 2% tetracaine, and 5% orphenadrine;

    c.     KetaLIGHT, which contains **3% ketamine**, 2% diclofenac, 3% baclofen, 6% gabapentin, and 1% lidocaine;

    d.     NeuroFlex, which contains 8% gabapentin, 8% dextromethorphan, 3% baclofen, 2% diclofenac, and 1% lidocaine;

    e.     FlexUltra, which contains 2% baclofen, 2% cyclobenzaprine, 3% diclofenac, and 2% tetracaine; and

    f.     NeuroGel, which contains 0.3% meloxicam, 3% topiramate, and 5% lidocaine.

(*Id.* at ¶ 8).

### B.   "1, 2, 3 Strategy" and Automatic Refills.

Mr. Gobea and Dr. Caddick created a marketing scheme at the Company called the "1, 2, 3 strategy," whereby Defendants employ the use of pre-printed script pads that list the above drugs. (*Id.* at ¶ 9).  Pursuant to this scheme, Defendants' sales representatives "coach" doctors to number three compound products on the pre-printed script by telling the doctors   to first pick the creams and gels covered by Medicare.  (*Id.* at ¶ 14).  For example, the physician would write the numbers "1" and "2" next to NeuroGel and FlexGel, which are covered by Medicare Part D plan.  (*Id.*).  If a patient is not covered by Medicare, Medicaid, TRICARE or a private insurer, the doctors are told that Defendants will provide a 120-gram bottle of the same cream or gel for $15 to $45.  (*Id.* at ¶ 15).  This cash offer is noted in Defendants' marketing materials and was reinforced by RS Compounding's VP of Sales and Marketing Jon Taylor ("Vice President Taylor"), who instructed sales representatives to "fill out a sample prescription and highlight how you are suggesting they fill it out . . . .  Repeating your messaging on this until it sticks."  (*Id.* at ¶¶ 15-16).

Defendants instruct sales representatives to "coach" physicians to write the number "1" next to either NeuroMax, NeuroPlus-0, or KetaLIGHT because each of these creams contain ketamine, which provides the highest reimbursement rate; "2" next to either NeuroFlex (contains gabapentin) or FlexUltra (contains baclofen), which have the second-highest reimbursement rates of Defendants' drugs; and "3" next to NeuroGel, which has the lowest reimbursement rate of Defendants' drugs.  (*Id.* at ¶ 70).

Once the compound preferences for a patient have been numbered, sales representatives instruct the physicians to fax the pre-printed prescription to Defendants' offices

along with the patient's insurance information.  (*Id.* at ¶ 17).  Defendants have submitted claims for reimbursement to insurance companies and Medicare for amounts ranging from $400 to $3,000 per bottle for the above-listed compounds. (*Id.*).  Defendants regularly billed TRICARE $1,200 for the same 120-gram bottle that they charged uninsured patients between $15 and $45. (*Id.*). Mr. Gobea knowingly participated in setting these prices and in causing the fraudulent claims to be submitted to Medicare, Medicaid, TRICARE, and private insurers for reimbursements.  (*Id.*).

Mr. Gobea instructed the Company's sales representatives to automatically write in the number of refills (generally, "6") on the pre-printed script pads, irrespective of whether the doctor would have ordered the refills in the first place.[2]  (*Id.*).  As such, Defendants would automatically ship refills to patients, often of the most expensive products RS Compounding sold, and then seek reimbursement from the Government.  (*Id.*).  Mr. Gobea also participated in setting the different prices for the Company's compounds, and was involved in targeting geographical locations with high concentrations of military personnel in order to issue large quantities of compounding prescriptions to those individuals, knowing that TRICARE would reimburse the highly inflated costs.  (*Id.* at ¶¶ 71, 73).

Not long after she began working for Defendants, Relator started receiving complaints from physicians whose patients were angered by Defendants' automatic shipments of unneeded compounds and Defendants' excessive billing. These additional, unwanted compounds came at a cost of, in many instances, several thousand dollars.  (*Id.* at ¶ 64).

---

[2] During Relator's first year at RS Compounding, the Company prepopulated a check mark on its pre-printed script pads that it provided to physicians for the most expensive compounds the Company sold.  (*Id.* at ¶ 18).

6

Eventually Relator and another sales representative learned of Defendants' disparate pricing schemes and notified their superiors, including Vice President Taylor, who advised Relator not to question it because prices were set "at the top of the Company." (*Id.* at ¶¶ 76-80).  In other words, by Mr. Gobea and Dr. Caddick. (*Id.* at ¶ 80).

In or around 2013, Defendants increased their commissions to sales representatives to $150 and then $200 per compound for Medicare Part D reimbursements. (*Id.* at ¶¶ 82-83).  The $200 commissions, however, applied only to compounds that contained ketamine because Defendants would charge TRICARE, Medicare, Medicaid and private insurers thousands of dollars for each of those ketamine-containing compounds. (*Id.* at ¶ 83).  In order to further boost revenues, Defendants told their sales representatives to focus their marketing efforts on Medicare patients. (*Id.* at ¶ 85).  Vice President Taylor emailed sales representatives on March 2, 2013, as follows:

> Medicare Formulas! The Gel formulations are often covered by Medicare Part D which means potential sales credit for you. We are adding a FlexGel formula to go with the NeuroGel formula. This provide[s] a more neuropathic and inflammatory choice for these patients. Additionally these formulas are set apart on the prescription pad to remind the physician of the [Medicare Part D] insurance coverage.

(*Id.*).

### C.   Defendants Promote their Compounds as Treating Serious Medical Conditions With No Treatment Training of Their Sales Representatives.

Defendants claim that their creams and gels, which are not FDA-approved, treat medical conditions such as carpal tunnel syndrome, chemotherapy induced neuropathy, diabetic neuropathy, fibromyalgia, tendonitis, and arthritis. (*Id.* at ¶¶ 87-88).  However, Defendants do not train their sales representatives regarding proper use of their compounds, or

potential contra-indications or warnings. (*Id.* at ¶ 89). Nor do Defendants sufficiently inform patients about the proper use of or precautions for their compounds for these types of medical conditions. (*Id.* at ¶¶ 89-91) Instead, Defendants provide physicians with basic instructions that appear on the pre-printed script pads. (*Id.* at ¶ 90). Mr. Gobea even encourages the Company's sales representatives to visit OBGYNs to promote their compounds despite not providing sufficient warnings to patients, especially about the effects of ketamine. (*Id.* at ¶ 92).

Defendants, including Dr. Caddick, knowingly caused fraudulent claims to be submitted to TRICARE, Medicare, Medicaid, and private insurers. (*See e.g., id.* at ¶ 73). Mr. Gobea directed RS Compounding's sales representatives to engage in the disparate pricing scheme, the "1, 2, 3 strategy" marketing scheme, the automatic refills scheme, and the promotion of the Company's compounds with insufficient warnings scheme. (*See, e.g.*, *id.* at ¶¶ 73, 86, 94).

## PROCEDURAL HISTORY

Relator filed her initial complaint on December 16, 2013. (Dkt. 1). The Government investigated Relator's claims for years and filed a Notice of Election to Intervene in Part on April 28, 2017. (Dkt. 33). On June 30, 2017, the Government filed its Complaint in Partial Intervention. (Dkt. 36). On July 12, 2017, Relator filed her First Amended Complaint. (Dkt. 39). On September 1, 2017, the Government filed its Amended Complaint in Partial Intervention. (Dkt. 42). Defendants moved to dismiss the Relator's First Amended Complaint on September 20, 2017. (Dkt. 48).

## LEGAL ARGUMENT

### I.      F.R.C.P. 12(b)(6) AND 9(b) STANDARD IN THE FCA CONTEXT

The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).  Under the FCA, a relator may file an action against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government, or "knowingly makes, uses, or causes to be used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A), (B).  This element of scienter encompasses actual knowledge, deliberate indifference, and reckless disregard, and does not require proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a complaint's sufficiency, the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences."  *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010).  The defendant must meet "a very high burden," as motions to dismiss a complaint for failure to state a claim "should be denied unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of its claims."  *Jackam v. Hosp. Corp. of Am.*, 800 F.2d 1577, 1579 (11th Cir. 1986); *accord Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*, No. 13-cv-1408, 2014 U.S. Dist. LEXIS 193488, at *18 (M.D. Fla. Apr. 11, 2014).

Rule 9(b) requires that a pleader state with particularity the "circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The purpose of Rule 9(b) "in fraud actions [is to]

alert[] defendants to the precise misconduct with which they are charged and [to] protect[] defendants against spurious charges of immoral and fraudulent behavior." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988); *see United States v. Dyncorp*, No. 3-cv-816-Orl-31JGG, 2006 U.S. Dist. LEXIS 1838, at *14 (M.D. Fla. 2006) (citation omitted) (holding in FCA context that "[o]nce a plaintiff has satisfied Rule 9(b) as to one scheme, the purposes behind the rule have been served). "[T]here is no per se rule . . . that an FCA complaint must provide exact billing data or attach a representative sample claim" where other indicia of reliability are present. *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 2379 (2015).[3] Instead, the Court must determine "whether the allegations of a complaint contain sufficient <u>indicia of reliability</u> to satisfy Rule 9(b) on a case-by-case basis," reading all properly pleaded facts in concert. *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006) (emphasis added).

## II.   RELATOR'S COMPLAINT SATISFIES RULE 9(b)

Contrary to Defendants' position, Rule 9(b)'s standard is not so strict as to be inflexible, *see, e.g.*, *U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009), and consideration must be given to the totality of Relator's Complaint which identifies the who, what, when, where, and how of Defendants' fraudulent schemes. In recent years, courts both within and outside of this Circuit have recognized that "[a]lleging the who, what, when, where, and how of the presentment . . . is not the only way in which to skin the FCA-pleading cat." *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-CV-58, 2014 U.S. Dist. LEXIS 169555, at *44 (S.D. Ga. Dec. 8, 2014). "Rather, [Rule 9(b)] is context specific and flexible

---

[3] *Mastej*, while unpublished and not binding, may be cited as persuasive authority. 11th Cir. Rules, *Rule 36-2*.

and must remain so to achieve the remedial purpose of the False Claim Act." *Grubbs*, 565 F.3d at 190. Notwithstanding this, Relator's Complaint alleges the who, what, when, where, and how of the fraud here.

With regard to **who**, Relator identifies the specific players involved in the fraudulent schemes at issue, including, RS Compounding, Mr. Gobea, Dr. Caddick, and Vice President Taylor. (*See* Compl. at ¶¶ 3, 9-10, 17, 26, 35-36, 63, 65, 73, 80, 85-86, 92, 94). Concerning the **what**, Relator provides numerous allegations about, *inter alia,* the aforementioned fraudulent schemes at issue, such as disparate pricing and the "1, 2, 3" marketing scheme. (*See, e.g., id.* at ¶¶ 1, 3-4, 6, 9, 14-15, 17-18, 65-67, 71-73, 76, 79, 81-85, 89, 92). Relator's allegations demonstrate how fraudulent payments from health care programs were induced by way of these schemes, and how Defendants knowingly presented false claims derived therefrom. (*See id.* at ¶¶ 3, 17, 73, 86).

As for **when**, Relator alleges detailed actions and events involving the fraudulent schemes at issue and specifies that same took place between, at least, 2011 and 2013 while she was employed with Defendants; and continues to the present. (*See id.* at ¶¶ 3, 30). With respect to **where**, Relator alleges that the geographic scope of Defendant's fraudulent schemes range from Relator's N.Y. and N.J. sales territories to RS Compounding's primary office in Tampa, wherein Relator alleges the schemes were hatched and directed from. (*See id.* at ¶¶ 3, 30, 60).

The **how** of the fraud is thoroughly referenced and meticulously laid out in numerous paragraphs of the Complaint. In particular, Relator alleges fraud occurred with respect to: (1) disparate pricing (*id.* at ¶¶ 15, 17, 66, 81-85); (2) the "1, 2, 3" scheme (*id.* at ¶¶ 9, 14, 65-67); (3) automatic refills on pre-printed script pads (*id.* at ¶¶ 10, 18, 63-64); and (4) encouraging

the promotion and sale of compounds with insufficient warnings and lack of adequate training (*id.* at ¶¶ 89, 92). Relator even alleges the primary targets of Defendants' fraudulent schemes as Medicare and our military personnel through TRICARE reimbursements. (*See id.* at ¶¶ 1, 3-4, 6, 15, 17-18, 19-20, 71-73, 76, 79).

Defendants' reliance on cases such as *Atkins, Corsello*, and *Clausen* to contest the adequacy of Relator's pleading is misplaced given the far more detailed nature of Relator's allegations and her personal knowledge of the fraudulent schemes at issue. *See Atkins*, 470 F.3d at 1359 (taking issue with the relator hearing "rumors" about "shoddy . . . business . . . practices" and then "summarily conclud[ing] that the defendants submitted false claims); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005) (finding that relator alleged merely that he was "aware" of billing practices and that many of his allegations were based on "information and belief"); *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002) (concluding that the relator provided "mere conjecture" that the claims were submitted to the Government). Moreover, the holding in *Clausen* has been questioned, criticized, and distinguished by numerous courts in recent years, with courts in the Eleventh Circuit holding that a relator can provide "indicia of reliability" showing that false claims were submitted to the Government. *Mastej*, 591 F. App'x at 704.

Here, the schemes that were instituted and executed by the Defendants were expressly aimed at Medicare and TRICARE patients. At the very least, this supports a reasonable inference that Defendants' claims were submitted to Government healthcare programs, since the *sine qua non* of the scheme was to get paid exorbitant amounts for their compounds. There can be no question that as a sales representative being paid to put the Defendants' fraudulent

schemes into action, Relator has the requisite first-hand knowledge necessary for and has pled sufficiently detailed claims to put the Defendants on notice of the allegations against them to be a FCA whistleblower.  Accordingly, Relator's Complaint is both plausible and particular, thereby satisfying Rule 9(b)'s pleading standards.

## III.    RELATOR ADEQUATELY PLED FCA CLAIMS AGAINST GOBEA

Defendants seek to hold Relator to a higher standard than that required by controlling case law, arguing that the Complaint should be dismissed under Rule 12(b)(6) because it "neither quotes nor cites any statements by Mr. Gobea to Relator or any others to direct or encourage FCA violations."  (Defs. Br. at 4).

On a motion to dismiss, the issue "is not whether [plaintiffs] may ultimately prevail on the 'piercing the corporate veil' theory, but whether the allegations are sufficient to allow them to conduct discovery in an attempt to prove their allegations." *Jackam*, 800 F.2d at 1579-80. In the FCA context, a relator can overcome a Rule 12(b)(6) challenge from an individual defendant where the relator's complaint pleads "facts [that] could render plausible an inference that one or more of [the defendant's] officers <u>oversaw or actively participated in the alleged fraudulent scheme</u>," such as by signing agreements with the Government which contain false statements.  *U.S. ex rel. Lee v. Corinthian Colleges*, No. 07-1984, 2012 U.S. Dist. LEXIS 192076, at *19-20 (C.D. Cal. Apr. 19, 2012) (emphasis added) (citation omitted).

"While a corporate officer may be liable for the corporation's wrongs, such liability must be based on the officer's '<u>personal participation</u> . . . in the wrongful activities of [the] corporation.'" *United States v. Gericare Med. Supply, Inc.*, No. 99-0366, 2000 U.S. Dist. LEXIS 19661, at *32-33 (D. Ala. Dec. 11, 2000) (quoting *Delong Equip. Co. v. Washington*

*Mills Abrasive Co.*, 840 F.2d 843, 851 (11th Cir. 1988), *cert. denied*, 494 U.S. 1081 (1990));
*see United States v. Movtady*, 13 F. Supp. 3d 325 (S.D.N.Y. 2014) (denying motion to dismiss
against individual defendant who owned co-defendant company in FCA case).  Here, Relator
has alleged Mr. Gobea's personal participation in the fraudulent activity through, *inter alia*,
statements from a high-level RS Compounding executive Vice-President Taylor who claimed
that fraudulent pricing decisions came from "the top" (i.e., Mr. Gobea and Dr. Caddick).
(Compl. at ¶ 80).

The Government has intervened in and successfully resolved numerous FCA actions
against individual defendants in recent years.  *See, e.g.*, *Trakhter v. Provider Services, Inc.,
n/k/a BCFL Holdings, Inc.*, No. 1:11-CV-217 (S.D. Ohio) and *United States ex rel. Bourne
and Goodwin v. Brian Colleran*, No. 1:12-CV-935 (S.D. Ohio) (combined settlement
announced July 17, 2017 involving company and its <u>executives</u> paying approximately $19.5
million to resolve allegations pertaining to the submission of false claims for medically
unnecessary rehabilitation therapy and hospice services to Medicare); *John Doe v. Spectocor
Enterprise Services, LLC*, No. 14-1387 (D.N.J.) (settlement announced June 26, 2017
involving company and its <u>owner</u> in his personal capacity paying $10.56 million to resolve
Medicare fraud).

Here, Mr. Gobea is RS Compounding's sole owner and officer, exercising extensive
control over all of the Company's operations and employees.  (*See* Compl. at ¶ 35).  As Vice
President Taylor stated, employees are not to question pricing practices because the prices are
set "at the top of the company," directly implicating Mr. Gobea.  (*Id.* at ¶¶ 76-80).  Mr. Gobea
was responsible for devising the aforementioned fraudulent practices (e.g., the "1, 2, 3"

marketing scheme and the automatic refills on pre-printed script pads) and instructing his employees to put them into effect.  Thereby, Mr. Gobea knowingly caused RS Compounding's sales representatives to present the aforementioned false claims to government and private health care programs for reimbursement, and to make false records and statements material to such claims.  (*See, e.g.*, *id.* at ¶¶ 73, 86).  Alternatively, Mr. Gobea deliberately ignored and/or recklessly disregarded the (a) falsity of the information RS Compounding submitted to government and private health care programs to obtain reimbursement for exorbitant amounts, and (b) fraudulent practices of his employees.  In so doing, Mr. Gobea disregarded the corporate form and "personally participat[ed]" in fraudulent conduct sufficient to pierce the corporate veil and hold him personally liable.  *Gericare*, 2000 U.S. Dist. at *32-33.  These allegations are more than sufficient to state a claim under Rule 12(b)(6) and satisfy Rule 9(b)'s pleading standard with respect to Mr. Gobea in his personal capacity.

## IV.    RELATOR'S COMPLAINT SATISFIES *ESCOBAR*

Defendants' fraudulent schemes involving disparate pricing, the "1, 2, 3" marketing scheme, automatic refills on the pre-printed script pads, and insufficient warnings and inadequate training of sales representatives are all intertwined in such a way as to have resulted in false claims being submitted to the Government for reimbursement of medicinal compounds that can, in some instances, cost thousands more than what Defendants charged cash buyers. As concisely stated in the Government's Complaint: "If TRICARE knew it was paying over 2,100% more than cash payors, it would not have paid such high reimbursements to RS Compounding."  (Gov't Compl. at ¶ 64).

Defendants cite to *Universal Health Services v. United States ex rel. Escobar*, 136 S.

Ct. 1989 (2016) (a matter in which the relator ultimately prevailed), in making a bare bones argument that Relator's complained of conduct was not material to the Government's decision to pay.  The FCA defines the term "material" to mean "having a natural tendency to influence or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).  *Escobar* embraced the "natural tendency" test and "capable of influencing" formulation codified in the FCA, and found no meaningful difference between the FCA and common law formulations.  *Escobar*, 136 S. Ct. at 2002 (citations omitted).  The Court in *Escobar* explained that a matter is material if either a "reasonable man would attach importance" to it or "the defendant knew or had reason to know" that the Government attached importance to it.  *Id.* at 2002-03.  At the motion to dismiss stage, however, the plaintiff need only plead enough facts to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012), plus whatever additional particularity may be required by Rule 9(b), *Escobar*, 136 S. Ct. at 2004 n.6.

If charging the Government, in some instances, more than 6,000 times the price Defendants charged cash buyers for the **same** compound is not material, then we should assume that nothing is material.  No reasonable person would find it immaterial when they learned that they were being charged thousands of times more for the same compounds. Relator alleges that, *inter alia*, Defendants' "1, 2, 3" marketing scheme whereby Defendants' sales representative "coached" physicians to order Defendants' most expensive and highest reimbursed compounds along with the six automatic refills on the Company's pre-printed script pads led to and ensured an increase in the false claims submitted to the Government for

the exorbitantly priced drugs.  (*See, e.g.*, Compl. at ¶¶ 1, 3-4, 6, 9, 14-15, 17-18, 65-67, 71-73, 76, 79, 81-85, 89, 92).

Further, the very nature of the compounds at issue favor a finding of materiality. Defendants' primary and most promoted compounds include the controlled dangerous substance ketamine, which in varying dosages serves as, *inter alia*, an animal tranquilizer and a "date rape drug."  There is no way to verify that each batch of the compounds at issue had the same chemical make-up as the prior batch or that each ingredient was included in the same amount.  With inadequate training for its sales force and insufficient warnings, there was no way for a patient or physician to know whether the compound could actually cure or treat a condition or even know if it would cause more harm given that the compounds could be different from batch to batch.

More importantly, given the procedural posture of this action, the Court may take judicial notice of the fact that the Government considered Defendants' fraudulent conduct material because it investigated Relator's claims over a period of years <u>and decided to intervene</u>.  The Government's Complaint alleges that pursuant to Defendants' agreement with TRICARE, Defendants were required to bill the Government the same price they charged cash buyers. (Gov't Compl. at ¶¶ 41-44). Defendants falsely certified compliance with this requirement, instead charging the Government grossly inflated prices (e.g., $4,389.50 for the same compounds it sold to cash buyers for $45).  (*Id.* at ¶ 16); *see U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) (noting in FCA context that where a "company overcharges under a government contract, the claim for payment itself is literally false or fraudulent.").  Accordingly, Defendants' arguments that Relator fails to satisfy *Escobar*'s

materiality requirements are without merit.

### V. THE SECOND, THIRD AND FOURTH CLAIMS ARE WELL PLED.

Defendants offer threadbare arguments in opposition to Relator's Second, Third, and Fourth Claims. (Defs. Br. at 6-7). While "the false certifications and representations made or caused to be made by" Defendants and their "obligations" have already been discussed throughout this brief, Relator reiterates that Defendants falsely certified under their provider agreement with TRICARE that they were charging the Government the same prices they charged cash buyers–those certifications are demonstrably false. (Gov't Compl. at ¶¶ 41-44). In addition, as Relator has alleged, Defendants would charge Medicare $400 to $3,000, TRICARE $1,200, and cash buyers $15 to $45 for the same compound and would, at least in some instances, ship unsuspecting patients six automatic refills of its creams and gels that were medically unnecessary. Defendants were obligated but failed to return their "ill-gotten gains" to the Government. (Compl. at ¶ 17; Gov't Compl. at ¶¶ 47, 82).

A defendant is liable for conspiracy under the FCA "if the relator can prove two elements: (1) that the defendant conspired with at least one person to get a false or fraudulent claim paid by the government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid." *United States v. LifePath Hospice, Inc.*, No. 10-cv-1061, 2016 U.S. Dist. LEXIS 129405, at *28 (M.D. Fla. Sept. 22, 2016). Relator alleges that Mr. Gobea and Dr. Caddick worked together, through and with RS Compounding, to set the disparate prices at issue, devise and implement the "1, 2, 3" marketing scheme and automatic refills, and to provide insufficient warnings to patients and inadequate training to RS Compounding's sales representatives. (*See* Compl. at ¶¶ 63, 65, 73, 80, 92, 94). Relator

further alleges that Defendants knowingly submitted false claims based on these fraudulent schemes.  (*See id.* at ¶¶ 80, 86, 94).  Accordingly, Relator has adequately pled her claims.

## VI.    DISMISSAL OF DISPARATE PRICING CLAIM UNWARRANTED

While the FCA provides that the "Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened," the "relator's initial complaint continues to be the operative complaint for all non-intervened claims and relators remain a party to the Government's intervened claims and continue to have rights to participate in those claims."  *U.S. ex rel. Sansbury v. LB&B Assocs., Inc.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014) (holding that "because the Government's complaint in intervention supersedes Relators' complaint with respect to the intervened claims, and because Relators have the right to continue as parties to this action, the Court will deny Defendants' motion to dismiss Relators' claims, to the extent that they are duplicative of the Government's claims, as moot").

Relator does not dispute her disparate pricing claim against Defendants is superseded by the Government's Usual and Customary Price claim in the Government's Complaint, but even if that claim had not been superseded, dismissal would be inappropriate because Relator satisfies the pleading standard as argued in Points I through V, *infra*. (*See* Compl. at ¶¶ 1, 3-4, 6, 9, 14-15, 17-18, 65-67, 71-73, 76, 79, 81-85, 89, 92; Gov't Compl. at ¶¶ 41-44).  In the off chance that the Government ceases to pursue the disparate pricing claims against Defendants, Relator reserves the right to pursue those claims against all defendants.

In addition, Relator may proceed with the claims that the Government has <u>not</u> intervened in as of this date, and respectfully submits that dismissal of her disparate pricing

claim is unwarranted given that Relator remains a party and any duplicative claims shared with the Government are deemed "moot." *Sansbury*, 58 F. Supp. 3d 37 at 47.

## VII.    IF MOTION IS GRANTED, SO SHOULD LEAVE TO AMEND

In the unlikely event that the Court identify any pleading deficiencies requiring dismissal, Relator respectfully requests leave to amend to address those issues.  Federal Rule of Civil Procedure 15(a)(2) provides: "[t]he court should freely give leave when justice so requires."  Moreover, a plaintiff "ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Here, Relator is facing an initial challenge to her Complaint and is not on notice of any pleading deficiencies, thus dismissal with prejudice would not be appropriate.  *See Friedlander v. Nims*, 755 F.2d 810, 811–12 (11th Cir. 1985) (dismissal with prejudice was appropriate where court gave "specific and repeated warnings" that amendment was necessary). Thus, should the Court conclude that part or all of the Complaint is subject to dismissal, Relator requests leave to amend pursuant to Rule 15(a)(2).

## CONCLUSION

Based on the foregoing, Relator respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

By:

Dated:   October 4, 2017          　　　　　 */s/ G. Wrede Kirkpatrick*
　　　　　　　　　　　　　　　　　　　　　　G. Wrede Kirkpatrick
　　　　　　　　　　　　　　　　　　　　　　Florida Bar No. 0984116
　　　　　　　　　　　　　　　　　　　　　　HINES NORMAN HINES, P.L.
　　　　　　　　　　　　　　　　　　　　　　315 S. Hyde Park Avenue
　　　　　　　　　　　　　　　　　　　　　　Tampa, Florida 33606
　　　　　　　　　　　　　　　　　　　　　　Tel: (813) 251-8659

Fax: (813) 254-6153
wkirkpatrick@hnh-law.com

By:      */s/ Robert A. Magnanini*
Robert A. Magnanini
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, New Jersey 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalaw.com

*Attorneys for Plaintiff/Relator*
*McKenzie Stepe*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 4th day of October, 2017, I electronically filed the

foregoing  *Plaintiff's' Response to  the Court's Order to Show Cause* with the Clerk of the

Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel

of record.

By:      *G. Wrede Kirkpatrick*
G. Wrede Kirkpatrick
Florida Bar No. 0984116
HINES NORMAN HINES, P.L.
315 S. Hyde Park Avenue
Tampa, Florida 33606
Tel: (813) 251-8659
Fax: (813) 254-6153
wkirkpatrick@hnh-law.com