UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF VIRGINIA, the COMMONWEALTH OF MASSACHUSETTS, and the States of CALIFORNIA, COLORADO, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, NEVADA, NEW JERSEY, NEW MEXICO, OKLAHOMA, TENNESSEE, TEXAS, and the policyholders of XYZ Nos. 1-10 Insurance Companies, <br><br> *ex rel.*, MCKENZIE STEPE, <br><br>     Plaintiffs, <br><br>  v. <br><br> RS COMPOUNDING LLC d/b/a ZOE SCRIPTS LABORATORY SERVICES, LLC, and d/b/a WESTCHASE COMPOUNDING PHARMACY, RENIER GOBEA, STEPHEN M. CADDICK, Pharm.D., and JOHN DOE CORPORATIONS 1-10, all whose true names are unknown, <br><br>     Defendants. | Case No. 8:13-cv-3150-T-33AEP |

**PLAINTIFF/RELATOR'S OPPOSITION TO**
**MOTION TO DISMISS AMENDED COMPLAINT**

Plaintiff/Relator, McKenzie Stepe ("Relator"), by and through undersigned counsel, hereby opposes Defendant STEPHEN M. CADDICK, Pham.D's Motion to Dismiss Relator's Amended Complaint and as grounds therefore states as follows:

**PRELIMINARY STATEMENT**

Over a period of several years, Defendant RS Compounding LLC (a pharmacy, hereinafter "RS Compounding" or the "Company") and its defendant-owners Renier Gobea and Stephen M. Caddick, Pharm.D. (collectively, "Defendants"), defrauded the federal and

state governments (the "Government") by charging Government health care programs, in some instances, $3,000 for the same medicinal compound they charged cash buyers $45 for, in violation of the False Claims Act ("FCA") and its state analogues. That is a 6,567% difference between the price Defendants routinely charged the Government as opposed to cash buyers. Mr. Gobea, RS Compounding's owner, directed the Company's sales representatives to implement fraudulent schemes, including disparate pricing, coaching physicians to prescribe high reimbursement rate compounds, providing pre-printed prescription/script pads with upwards of six automatic refills, and encouraging the promotion and sale of compounds with insufficient warnings and inadequate training for sales staff. Dr. Caddick, a founder of RS Compounding who became a manager at the Company following the sale of his ownership interest to Mr. Gobea in 2014, helped devise and implement these fraudulent strategies. Defendants targeted, among others, the TRICARE program.

Dr. Caddick moves to dismiss Relator's First Amended Complaint ("Complaint"), making unsupported arguments that, if adopted, would significantly hinder the Government's ability to prosecute pharmaceutical companies under the FCA. Dr. Caddick urges the Court to ignore Relator's detailed description of Defendants' fraudulent schemes and intentional violations of the FCA because Relator was, in Dr. Caddick's words, not in a position within RS Compounding to state specifically who submitted claims for payment to the Government and when. Defendant thereby suggests that a sales representative, like Relator, cannot satisfy Rule 9(b)'s pleading requirements because she supposedly lacks direct, first-hand knowledge of submissions of claims to federal health care programs. Dr. Caddick's assertion is belied by the fact that the Government has partially intervened in this matter, despite knowing that

Relator was a sales representative. Also, Dr. Caddick ignores the fact that numerous successful FCA cases in the health care sector have been brought by sales representatives, and that sales representatives are often the people in the best position to know the company's sales strategies and what takes place at the physician/patient level. *See, e.g., United States ex rel. Fuentes, Russo v. Genzyme Corp.*, No. 09-cv-1245 (M.D. Fla. settled 2013) (pharmaceutical sales representative whistleblowers, $22.8 million settlement).

Dr. Caddick, Mr. Gobea and RS Compounding produced six compounds, made from different mixtures of the same ingredients, while defrauding the Government of millions of dollars. The Department of Justice has intervened in part in Relator's Complaint, and Relator is pursuing the remainder on behalf of the Government to recover approximately $60 million.

## STATEMENT OF FACTS

RS Compounding, also doing business as Westchase Compounding Pharmacy and Zoe Scripts, is a compounding pharmacy based in Tampa, which manufactures compounding creams and gels on an industrial scale with approximately 150 sales representatives worldwide. (Compl. at ¶¶ 30, 60-61). Mr. Gobea, who is not a licensed pharmacist, co-founded RS Compounding with Dr. Caddick in 2004. Sometime thereafter, Mr. Gobea sold his interest to Dr. Caddick. (*Id.* at ¶ 35). In or around February 2014, however, Mr. Gobea returned to RS Compounding after purchasing Dr. Caddick's interest for several million dollars, while Dr. Caddick remained as a manager. (*Id.*). Defendants hired Relator in November 2011, at a time when the company was run by Dr. Caddick, as a sales representative in a territory that included N.J. and N.Y. (*Id.* at ¶ 30). She held that position until she left the Company in February 2013. (*Id.*).

### A. Defendants' Compound Gels and Creams.

Unlike traditional compounding pharmacies that combine specific pharmaceuticals based on a doctor's unique request for an individual patient, RS Compounding manufactures and distributes massive quantities of pre-made compounds throughout the country. (*Id.* at ¶ 7). The following are among the primary compounds that Defendants market and distribute:

   a. NeuroMax, which contains **15% ketamine**, 6% gabapentin, 0.2% clonidine, 7% prilocaine, 3% baclofen, and 2% diclofenac;
   b. NeuroPlus-O, which contains **10% ketamine**, 2% cyclobenzaprine, 3% diclofenac, 6% gabapentin, 2% tetracaine, and 5% orphenadrine;
   c. KetaLIGHT, which contains **3% ketamine**, 2% diclofenac, 3% baclofen, 6% gabapentin, and 1% lidocaine;
   d. NeuroFlex, which contains 8% gabapentin, 8% dextromethorphan, 3% baclofen, 2% diclofenac, and 1% lidocaine;
   e. FlexUltra, which contains 2% baclofen, 2% cyclobenzaprine, 3% diclofenac, and 2% tetracaine; and
   f. NeuroGel, which contains 0.3% meloxicam, 3% topiramate, and 5% lidocaine.

(*Id.* at ¶ 8).

### B. "1, 2, 3 Strategy" and Automatic Refills.

Dr. Caddick and Mr. Gobea created a marketing scheme at the Company called the "1, 2, 3 strategy," whereby Defendants employ the use of pre-printed script pads that list the above drugs. (*Id.* at ¶ 9). Pursuant to this scheme, Defendants' sales representatives "coach" doctors to number three compound products on the pre-printed script by telling the doctors to first pick the creams and gels covered by Medicare. (*Id.* at ¶ 14). For example, the physician would write the numbers "1" and "2" next to NeuroGel and FlexGel, which are covered by Medicare Part D plan. (*Id.*). If a patient is not covered by Medicare, Medicaid, TRICARE or a private insurer, the doctors are told that Defendants will provide a 120-gram

bottle of the same cream or gel for $15 to $45.  (*Id.* at ¶ 15).  This cash offer is noted in Defendants' marketing materials and was reinforced by RS Compounding's VP of Sales and Marketing Jon Taylor ("Vice President Taylor"), who instructed sales representatives to "fill out a sample prescription and highlight how you are suggesting they fill it out . . . . Repeating your messaging on this until it sticks."  (*Id.* at ¶¶ 15-16).

Defendants instruct sales representatives to "coach" physicians to write the number "1" next to either NeuroMax, NeuroPlus-0, or KetaLIGHT because each of these creams contain ketamine, which provides the highest reimbursement rate; "2" next to either NeuroFlex (contains gabapentin) or FlexUltra (contains baclofen), which have the second-highest reimbursement rates of Defendants' drugs; and "3" next to NeuroGel, which has the lowest reimbursement rate of Defendants' drugs.  (*Id.* at ¶ 70).

Once the compound preferences for a patient have been numbered, sales representatives instruct the physicians to fax the pre-printed prescription to Defendants' offices along with the patient's insurance information.  (*Id.* at ¶ 17).  Defendants have submitted claims for reimbursement to insurance companies and Medicare for amounts ranging from $400 to $3,000 per bottle for the above-listed compounds.  (*Id.*).  Defendants regularly billed TRICARE $1,200 for the same 120-gram bottle that they charged uninsured patients between $15 and $45.  (*Id.*). Dr. Caddick and Mr. Gobea knowingly created and participated in setting these prices and in causing the fraudulent claims to be submitted to Medicare, Medicaid, TRICARE, and private insurers for reimbursements.  (*Id.*).

Dr. Caddick and Mr. Gobea instructed the Company's sales representatives to automatically write in the number of refills (generally, "6") on the pre-printed script pads,

irrespective of whether the doctor would have ordered the refills in the first place.[1] (*Id.* at ¶¶ 17-18). As such, Defendants would automatically ship refills to patients, often of the most expensive products RS Compounding sold, and then seek reimbursement from the Government. (*Id.* at ¶18). Dr. Caddick and Mr. Gobea also participated in setting the different prices for the Company's compounds, and were involved in targeting geographical locations with high concentrations of military personnel in order to issue large quantities of compounding prescriptions to those individuals, knowing that TRICARE would reimburse the highly inflated costs. (*Id.* at ¶¶ 71, 73).

Shortly after she began working for Defendants, Relator started receiving complaints from physicians whose patients were angered by Defendants' automatic shipments of unneeded compounds and Defendants' excessive billing. (*Id.* at ¶¶ 64, 74). These additional, unwanted compounds came at a cost of, in many instances, several thousand dollars. (*Id.* at ¶ 64). Eventually Relator and another sales representative learned of Defendants' disparate pricing schemes and notified their superiors, including Vice President Taylor, who advised Relator not to question it because prices were set "at the top of the Company." (*Id.* at ¶¶ 76-80). In other words, by Dr. Caddick and Mr. Gobea. (*Id.* at ¶ 80).

In or around 2013, Defendants increased their commissions to sales representatives to $150 and then $200 per compound for Medicare Part D reimbursements. (*Id.* at ¶¶ 82-83). The $200 commissions, however, applied only to compounds that contained ketamine because Defendants would charge TRICARE, Medicare, Medicaid and private insurers thousands of dollars for each of those ketamine-containing compounds. (*Id.* at ¶ 83). In

---

[1] During Relator's first year at RS Compounding, the Company prepopulated a check mark on its pre-printed script pads that it provided to physicians for the most expensive compounds the Company sold. (*Id.* at ¶ 18).

order to further boost revenues, Defendants told their sales representatives to focus their marketing efforts on Medicare patients. (*Id.* at ¶ 85). Vice President Taylor emailed sales representatives on March 2, 2013, as follows:

> Medicare Formulas! The Gel formulations are often covered by Medicare Part D which means potential sales credit for you. We are adding a FlexGel formula to go with the NeuroGel formula. This provide[s] a more neuropathic and inflammatory choice for these patients. Additionally these formulas are set apart on the prescription pad to remind the physician of the [Medicare Part D] insurance coverage.

(*Id.*).

### C. Defendants Promote their Compounds as Treating Serious Medical Conditions With No Treatment Training of Their Sales Representatives.

Defendants claim that their creams and gels, which are not FDA-approved, treat medical conditions such as carpal tunnel syndrome, chemotherapy induced neuropathy, diabetic neuropathy, fibromyalgia, tendonitis, and arthritis. (*Id.* at ¶¶ 87-88). However, Defendants do not train their sales representatives regarding proper use of their compounds, or potential contra-indications or warnings. (*Id.* at ¶ 89). Nor do Defendants sufficiently inform patients about the proper use of or precautions for their compounds for these types of medical conditions. (*Id.* at ¶¶ 89-91) Instead, Defendants provide physicians with basic instructions that appear on the pre-printed script pads. (*Id.* at ¶ 90). Dr. Caddick and Mr. Gobea even encourage the Company's sales representatives to visit OBGYNs to promote their compounds despite not providing sufficient warnings to patients, especially about the effects of ketamine. (*Id.* at ¶ 92).

Defendants knowingly caused fraudulent claims to be submitted to TRICARE, Medicare, Medicaid, and private insurers. (*See e.g., id.* at ¶ 73). Dr. Caddick and Mr. Gobea

directed RS Compounding's sales representatives to engage in the disparate pricing scheme, the "1, 2, 3 strategy" marketing scheme, the automatic refills scheme, and the promotion of the Company's compounds with insufficient warnings scheme. (*See, e.g.*, *id.* at ¶¶ 73, 86, 94).

## PROCEDURAL HISTORY

Relator filed her initial complaint on December 16, 2013. (Dkt. 1). The Government investigated Relator's claims for years and filed a Notice of Election to Intervene in Part on April 28, 2017. (Dkt. 33). On June 30, 2017, the Government filed its Complaint in Partial Intervention. (Dkt. 36). On July 12, 2017, Relator filed her First Amended Complaint. (Dkt. 39). On September 1, 2017, the Government filed its Amended Complaint in Partial Intervention. (Dkt. 42). Defendants RS Compounding and Mr. Gobea moved to dismiss the Relator's First Amended Complaint on September 20, 2017. (Dkt. 48). Relator filed her opposition on October 4, 2017. (Dkt. 65). Dr. Caddick moved to dismiss Relator's First Amended Complaint on October 11, 2017. (Dkt. 70).

## LEGAL ARGUMENT

### I. DEFENDANT CADDICK'S MOTION IS UNTIMELY

As the Court noted in its *sua sponte* Order to Show Cause against Relator (Dkt. 64), Dr. Caddick (a) failed to timely file his answer or motion to dismiss, and (b) never sought leave of the Court for an extension. Relator explained, in her response to the Order to Show Cause, that she *consented* to a brief extension of Dr. Caddick's filing deadlines in light of a recent hurricane. (Dkt. 67). However, Dr. Caddick never sought the Court's permission for this extension. Nor did Dr. Caddick seek leave of Court to file this motion out of time.

Accordingly, Relator respectfully requests that the Court deny Dr. Caddick's motion to dismiss as untimely, and enter default against Dr. Caddick.[2]

## II. F.R.C.P. 12(b)(6) AND 9(b) STANDARD IN THE FCA CONTEXT

The FCA is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968). Under the FCA, a relator may file an action against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the federal government, or "knowingly makes, uses, or causes to be used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. §§ 3729(a)(1)(A), (B). This element of scienter encompasses actual knowledge, deliberate indifference, and reckless disregard, and does not require proof of specific intent to defraud. 31 U.S.C. § 3729(b)(1).

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a complaint's sufficiency, the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences." *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010). The defendant must meet "a very high burden," as motions to dismiss a complaint for failure to state a claim "should be denied unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of its claims." *Jackam v. Hosp. Corp. of Am.*, 800 F.2d 1577, 1579 (11th Cir. 1986); *accord Kakawi Yachting, Inc. v. Marlow Marine Sales, Inc.*, No. 13-cv-1408, 2014 U.S. Dist. LEXIS 193488, at *18 (M.D. Fla. Apr. 11, 2014).

---

[2] Relator has already requested this Default previously in her response to the Show Cause. *See* Dkt. 67.

Rule 9(b) requires that a pleader state with particularity the "circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]here is no per se rule . . . that an FCA complaint must provide exact billing data or attach a representative sample claim" where other indicia of reliability are present. *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 704 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 2379 (2015).[3] Instead, the Court must determine "whether the allegations of a complaint contain sufficient indicia of reliability to satisfy Rule 9(b) on a case-by-case basis," reading all properly pleaded facts in concert. *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1358 (11th Cir. 2006).

### III.     RELATOR'S COMPLAINT SATISFIES RULE 9(b)

Contrary to Dr. Caddick's position, Rule 9(b)'s standard is not so strict as to be inflexible, *see, e.g.*, *U.S. ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009), and consideration must be given to the totality of Relator's Complaint which identifies the who, what, when, where, and how of Defendants' fraudulent schemes. In recent years, courts both within and outside of this Circuit have recognized that "[a]lleging the who, what, when, where, and how of the presentment . . . is not the only way in which to skin the FCA-pleading cat." *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-CV-58, 2014 U.S. Dist. LEXIS 169555, at *44 (S.D. Ga. Dec. 8, 2014). "Rather, [Rule 9(b)] is context specific and flexible and must remain so to achieve the remedial purpose of the False Claim Act." *Grubbs*, 565 F.3d at 190. Notwithstanding this, Relator's Complaint alleges the who, what, when, where, and how of the fraud here.

With regard to **who**, Relator identifies the specific players involved in the fraudulent

---

[3] *Mastej*, while unpublished and not binding, may be cited as persuasive authority. 11th Cir. Rules, *Rule* 36-2.

schemes at issue, including Dr. Caddick, RS Compounding, Mr. Gobea, and Vice President Taylor. (*See* Compl. at ¶¶ 3, 9-10, 17, 26, 35-36, 63, 65, 73, 80, 85-86, 92, 94). Concerning the **what**, Relator provides numerous allegations about, *inter alia,* the aforementioned fraudulent schemes at issue, such as disparate pricing and the "1, 2, 3" marketing scheme. (*See, e.g.*, *id.* at ¶¶ 1, 3-4, 6, 9, 14-15, 17-18, 65-67, 71-73, 76, 79, 81-85, 89, 92). Relator's allegations demonstrate how fraudulent payments from health care programs were induced by way of these schemes, and how Defendants knowingly presented false claims derived therefrom. (*See id.* at ¶¶ 3, 17, 73, 86).

As for **when**, Relator alleges detailed actions and events involving the fraudulent schemes at issue and specifies that same took place between, at least, 2011 and 2013 while she was employed with Defendants; and continues to the present. (*See id.* at ¶¶ 3, 30). With respect to **where**, Relator alleges that the geographic scope of Defendant's fraudulent schemes range from Relator's N.Y. and N.J. sales territories to RS Compounding's primary office in Tampa, wherein Relator alleges the schemes were hatched and directed from. (*See id.* at ¶¶ 3, 30, 60).

The **how** of the fraud is thoroughly referenced and meticulously laid out in numerous paragraphs of the Complaint. In particular, Relator alleges fraud occurred with respect to: (1) disparate pricing (*id.* at ¶¶ 15, 17, 66, 81-85); (2) the "1, 2, 3" scheme (*id.* at ¶¶ 9, 14, 65-67); (3) automatic refills on pre-printed script pads (*id.* at ¶¶ 10, 18, 63-64); and (4) encouraging the promotion and sale of compounds with insufficient warnings and lack of adequate training (*id.* at ¶¶ 89, 92). Relator even alleges the primary targets of Defendants' fraudulent schemes as Medicare and our military personnel through TRICARE reimbursements. (*See*

*id.* at ¶¶ 1, 3-4, 6, 15, 17-18, 19-20, 71-73, 76, 79).

Dr. Caddick's reliance on cases such as *Atkins, Corsello*, and *Clausen* to contest the adequacy of Relator's pleading is misplaced given the far more detailed nature of Relator's allegations and her personal knowledge of the fraudulent schemes at issue. *See Atkins*, 470 F.3d at 1359 (taking issue with the relator hearing "rumors" about "shoddy . . . business . . . practices" and then "summarily conclud[ing] that the defendants submitted false claims"); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005) (finding that relator alleged merely that he was "aware" of billing practices and that many of his allegations were based on "information and belief"); *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1313 (11th Cir. 2002) (concluding that the relator provided "mere conjecture" that the claims were submitted to the Government). Moreover, the holding in *Clausen* has been questioned, criticized, and distinguished by numerous courts in recent years, with courts in the Eleventh Circuit holding that a relator can provide "indicia of reliability" showing that false claims were submitted to the Government. *Mastej*, 591 F. App'x at 704.

Here, the schemes that were instituted and executed by the Defendants were expressly aimed at Government insured patients. At the very least, this supports a reasonable inference that Defendants' claims were submitted to Government healthcare programs, since the *sine qua non* of the scheme was to get paid exorbitant amounts for their compounds. As a sales representative being paid to put the Defendants' fraudulent schemes into action, Relator has the requisite first-hand knowledge necessary to be a FCA whistleblower, and has pled sufficiently detailed claims to put Dr. Caddick on notice of the allegations against him. Relator's Complaint is both plausible and particular, thus satisfying Rule 9(b).

### IV. RELATOR ADEQUATELY PLED FCA CLAIMS AGAINST DR. CADDICK

On a motion to dismiss, the issue "is not whether [plaintiffs] may ultimately prevail on the 'piercing the corporate veil' theory, but whether the allegations are sufficient to allow them to conduct discovery in an attempt to prove their allegations." *Jackam*, 800 F.2d at 1579-80. A relator can overcome a Rule 12(b)(6) challenge from an individual defendant where the relator's complaint pleads "facts [that] could render plausible an inference that one or more of [the defendant's] officers' <u>oversaw or actively participated in the alleged fraudulent scheme</u>," such as by signing agreements with the Government which contain false statements. *U.S. ex rel. Lee v. Corinthian Colleges*, No. 07-1984, 2012 U.S. Dist. LEXIS 192076, at *19-20 (C.D. Cal. Apr. 19, 2012) (emphasis added) (citation omitted); *see United States v. Movtady*, 13 F. Supp. 3d 325 (S.D.N.Y. 2014) (denying motion to dismiss against individual defendant who owned co-defendant company in FCA case). Here, Relator has alleged Dr. Caddick's personal participation in the fraudulent activity through, *inter alia*, statements from RS Compounding's Vice-President Taylor who claimed that fraudulent pricing decisions came from "the top" (i.e., Dr. Caddick and Mr. Gobea). (Compl. at ¶ 80).

The Government has intervened in and successfully resolved numerous FCA actions against individual defendants in recent years. *See, e.g.*, *Trakhter v. Provider Services, Inc., n/k/a BCFL Holdings, Inc.*, No. 1:11-CV-217 (S.D. Ohio) and *United States ex rel. Bourne and Goodwin v. Brian Colleran*, No. 1:12-CV-935 (S.D. Ohio) (combined settlement involving company and its <u>executives</u> paying approximately $19.5 million to resolve allegations pertaining to the submission of false claims for medically unnecessary rehabilitation therapy and hospice services to Medicare); *John Doe v. Spectocor Enterprise*

*Services, LLC*, No. 14-1387 (D.N.J.) (settlement involving company and its <u>owner</u> in his personal capacity paying $10.56 million to resolve Medicare fraud).

Here, Dr. Caddick is RS Compounding's former owner and current manager, exercising extensive control over the Company and its employees. (*See* Compl. at ¶ 36). As Vice President Taylor stated, employees are not to question pricing practices because the prices are set "at the top of the company," directly implicating Dr. Caddick and Mr. Gobea. (*Id.* at ¶¶ 76-80). Dr. Caddick and Mr. Gobea were responsible for devising the aforementioned fraudulent practices (e.g., the "1, 2, 3" marketing scheme and the automatic refills on pre-printed script pads) and instructing their employees to put them into effect. Thereby, Dr. Caddick and Mr. Gobea knowingly caused RS Compounding to present the aforementioned false claims to government and private health care programs for reimbursement, and to make false records and statements material to such claims. (*See, e.g.*, *id.* at ¶¶ 73, 86). Alternatively, Dr. Caddick and Mr. Gobea deliberately ignored and/or recklessly disregarded the (a) falsity of the information RS Compounding submitted to government and private health care programs to obtain reimbursement for exorbitant amounts, and (b) fraudulent practices of their employees. In so doing, Dr. Caddick and Mr. Gobea disregarded the corporate form and "personally participat[ed]" in fraudulent conduct sufficient to pierce the corporate veil and hold them personally liable. *Gericare*, 2000 U.S. Dist. at *32-33. These allegations are more than sufficient to state a claim under Rule 12(b)(6) and satisfy Rule 9(b)'s pleading standard with respect to Dr. Caddick in his personal capacity.

## V. RELATOR'S COMPLAINT SATISFIES *ESCOBAR*

Defendants' fraudulent schemes involving disparate pricing, the "1, 2, 3" marketing scheme, automatic refills on the pre-printed script pads, and insufficient warnings and inadequate training of sales representatives are all intertwined in such a way as to have resulted in false claims being submitted to the Government for reimbursement of medicinal compounds that can, in some instances, cost thousands more than what Defendants charged cash buyers. As concisely stated in the Government's Complaint: "If TRICARE knew it was paying over 2,100% more than cash payers, it would not have paid such high reimbursements to RS Compounding." (Gov't Compl. at ¶ 64).

Dr. Caddick incorporates his co-defendants' arguments regarding *Universal Health Services v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (a matter in which the relator ultimately prevailed). Defendants argued that Relator's complained of conduct was not material to the Government's decision to pay. The FCA defines the term "material" to mean "having a natural tendency to influence or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). *Escobar* embraced the "natural tendency" test and "capable of influencing" formulation codified in the FCA, and found no meaningful difference between the FCA and common law formulations. *Escobar*, 136 S. Ct. at 2002 (citations omitted). The Court in *Escobar* explained that a matter is material if either a "reasonable man would attach importance" to it or "the defendant knew or had reason to know" that the Government attached importance to it. *Id.* at 2002-03. At the motion to dismiss stage, however, the plaintiff need only plead enough facts to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Resnick v.*

*AvMed, Inc.*, 693 F.3d 1317, 1325 (11th Cir. 2012), plus whatever additional particularity may be required by Rule 9(b), *Escobar*, 136 S. Ct. at 2004 n.6.

If charging the Government, in some instances, more than 6,000 times the price Defendants charged cash buyers for the **same** compound is not material, then we should assume that nothing is material. No reasonable person would find it immaterial if they were to learn that they were being charged thousands of times more for the same compounds. Relator alleges that Defendants' fraudulent schemes led to and ensured an increase in the false claims submitted to the Government for the exorbitantly priced drugs. (*See, e.g.*, Compl. at ¶¶ 1, 3-4, 6, 9, 14-15, 17-18, 65-67, 71-73, 76, 79, 81-85, 89, 92).

Further, the very nature of the compounds at issue favor a finding of materiality. Defendants' most promoted compounds include the controlled dangerous substance ketamine, which in varying dosages serves as an animal tranquilizer and a "date rape drug." There is no way to verify that each batch of the compounds at issue had the same chemical make-up as the prior batch or that each ingredient was included in the same amount. With inadequate training for its sales force and insufficient warnings, there was no way for a patient or physician to know whether the compound could actually treat a condition, or even know if it would cause more harm as the compounds could be different from batch to batch.

Given the procedural posture of this action, the Court may take judicial notice of the fact that the Government considered Defendants' fraudulent conduct material because it investigated Relator's claims for years and decided to intervene. The Government's Complaint alleges that pursuant to Defendants' agreement with TRICARE, Defendants were required to bill the Government the same price they charged cash buyers. (Gov't Compl. at

¶¶ 41-44). Defendants falsely certified compliance with this requirement, instead charging the Government grossly inflated prices (e.g., $4,389.50 for the same compounds it sold to cash buyers for $45). (*Id.* at ¶ 16); *see U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006) (where a "company overcharges under a government contract, the claim for payment itself is literally false or fraudulent."). Accordingly, Defendants' arguments that Relator fails to satisfy *Escobar*'s materiality requirements are without merit.

### VI. THE SECOND, THIRD AND FOURTH CLAIMS ARE WELL PLED.

Dr. Caddick offers threadbare arguments in opposition to Relator's Second, Third, and Fourth Claims. (Defs. Br. at 6-7). While "the false certifications and representations made or caused to be made by" Defendants and their "obligations" have already been discussed throughout this brief, <u>Relator reiterates that Defendants falsely certified under their provider agreement with TRICARE that they were charging the Government the same prices they charged cash buyers</u>–those certifications are demonstrably false. (Gov't Compl. at ¶¶ 41-44). In addition, as Relator has alleged, Defendants would charge Medicare $400 to $3,000, TRICARE $1,200, and cash buyers $15 to $45 for the same compound and would, at least in some instances, ship unsuspecting patients six automatic refills of its creams and gels that were medically unnecessary. Defendants were obligated but failed to return their "ill-gotten gains" to the Government. (Compl. at ¶ 17; Gov't Compl. at ¶¶ 47, 82).

A defendant is liable for conspiracy under the FCA "if the relator can prove two elements: (1) that the defendant conspired with at least one person to get a false or fraudulent claim paid by the government; and (2) that at least one of the conspirators performed an overt act to get a false or fraudulent claim paid." *United States v. LifePath Hospice, Inc.*, No. 10-

cv-1061, 2016 U.S. Dist. LEXIS 129405, at *28 (M.D. Fla. Sept. 22, 2016). Relator alleges that Dr. Caddick and Mr. Gobea worked together, through and with RS Compounding, to set the disparate prices at issue, devise and implement the "1, 2, 3" marketing scheme and automatic refills, and to provide insufficient warnings to patients and inadequate training to RS Compounding's sales representatives. (*See* Compl. at ¶¶ 63, 65, 73, 80, 92, 94). Relator further alleges that Defendants knowingly submitted false claims based on these fraudulent schemes. (*See id.* at ¶¶ 80, 86, 94). Accordingly, Relator has adequately pled her claims.

### VII.   DISMISSAL OF DISPARATE PRICING CLAIM UNWARRANTED

While the FCA provides that the "Government's complaint in intervention becomes the operative complaint as to all claims in which the government has intervened," the "relator's initial complaint continues to be the operative complaint for all non-intervened claims and relators remain a party to the Government's intervened claims and continue to have rights to participate in those claims." *U.S. ex rel. Sansbury v. LB&B Assocs., Inc.*, 58 F. Supp. 3d 37, 47 (D.D.C. 2014) ("because the Government's complaint in intervention supersedes Relators' complaint with respect to the intervened claims, and because Relators have the right to continue as parties to this action, the Court will deny Defendants' motion to dismiss Relators' claims . . . as moot").

Relator does not dispute that her disparate pricing claim against Defendants is superseded by the Government's Usual and Customary Price claim in the Government's Complaint, but even if that claim had not been superseded, dismissal would be inappropriate because Relator satisfies the pleading standard as argued in Points I through V, *infra*. (*See* Compl. at ¶¶ 1, 3-4, 6, 9, 14-15, 17-18, 65-67, 71-73, 76, 79, 81-85, 89, 92; Gov't Compl. at

¶¶ 41-44). If the Government ceases to pursue the disparate pricing claims against Defendants, Relator reserves the right to pursue those claims against all Defendants.

In addition, Relator may proceed with the claims that the Government has <u>not</u> intervened in as of this date, and respectfully submits that dismissal of her disparate pricing claim is unwarranted given that Relator remains a party and any duplicative claims shared with the Government are deemed "moot." *Sansbury*, 58 F. Supp. 3d 37 at 47.

### VIII. IF MOTION IS GRANTED, SO SHOULD LEAVE TO AMEND

If the Court identifies any pleading deficiencies requiring dismissal, Relator respectfully requests leave to amend to address those issues. Federal Rule of Civil Procedure 15(a)(2) provides: "[t]he court should freely give leave when justice so requires." Moreover, a plaintiff "ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, Relator is facing an initial challenge to her Complaint and is not on notice of any pleading deficiencies, thus dismissal with prejudice would not be appropriate. *See Friedlander v. Nims*, 755 F.2d 810, 811–12 (11th Cir. 1985) (dismissal with prejudice was appropriate where court gave "specific and repeated warnings" that amendment was necessary). Thus, should the Court conclude that part or all of the Complaint is subject to dismissal, Relator requests leave to amend pursuant to Rule 15(a)(2).

### CONCLUSION

Based on the foregoing, Relator respectfully requests that the Court deny Defendant Dr. Caddick's Motion to Dismiss in its entirety.

Respectfully submitted,

Dated: October 25, 2017     By: */s/ G. Wrede Kirkpatrick*
G. Wrede Kirkpatrick
Florida Bar No. 0984116
HINES NORMAN HINES, P.L.
315 S. Hyde Park Avenue
Tampa, Florida 33606
Tel: (813) 251-8659
Fax: (813) 254-6153
wkirkpatrick@hnh-law.com

By: */s/ Robert A. Magnanini*
Robert A. Magnanini
STONE & MAGNANINI LLP
100 Connell Drive, Suite 2200
Berkeley Heights, New Jersey 07922
Tel: (973) 218-1111
Fax: (973) 218-1106
rmagnanini@stonemagnalaw.com

*Attorneys for Plaintiff/Relator
McKenzie Stepe*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 25th day of October, 2017, I electronically filed the foregoing *Plaintiff/Relator's Opposition to Motion to* Dismiss with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By: *G. Wrede Kirkpatrick*
G. Wrede Kirkpatrick
Florida Bar No. 0984116
HINES NORMAN HINES, P.L.
315 S. Hyde Park Avenue
Tampa, Florida 33606
Tel: (813) 251-8659
Fax: (813) 254-6153
wkirkpatrick@hnh-law.com