UNITED STATES OF AMERICA,
ex rel. MCKENZIE STEPE,

      Plaintiffs,

v.                          Case No. 8:13-cv-3150-T-33AEP

RS COMPOUNDING LLC d/b/a
ZOE SCRIPTS LABORATORY SERVICES,
LLC and d/b/a WESTCHASE
COMPOUNDING PHARMACY,
and RENIER GOBEA,

      Defendants.
_____/

## ORDER

    This matter comes before the Court pursuant to
Defendants Renier Gobea's Motion to Dismiss the United
States' Amended Complaint in Partial Intervention (Doc. # 74)
and RS Compounding LLC's Motion to Dismiss the United States'
Amended Complaint in Partial Intervention (Doc. # 75), both
filed on October 31, 2017. The United States responded on
November 21, 2017. (Doc. # 85). For the reasons that follow,
the Motions are denied.

## I.  Background

### A.  The Parties

Gobea "co-founded RS Compounding . . . with Dr. Stephen Caddick in 2004 . . . . Gobea is the current owner and director of RS Compounding." (Doc. # 42 at ¶ 10). RS Compounding is a compounding pharmacy that does business as Zoe Scripts and Westchase Compounding Pharmacy. (Id. at ¶¶ 8, 35). RS Compounding's products were prescribed to uninsured patients, patients covered by private insurance, and those covered by federal healthcare programs, such as TRICARE. (Id. at ¶¶ 12, 45).

TRICARE is the federal healthcare program that "provides coverage for approximately 9 million active duty military personnel and their families." (Id. at ¶ 12). "TRICARE's regulations prohibit fraudulent and abusive billing relationships." (Id. at ¶ 27). One type of abuse is "charging [TRICARE] beneficiaries rates for services and supplies that are in excess of those charges routinely charged by the provider to the general public." (Id.).

Express Scripts, Inc., is "the TRICARE retail and mail order pharmacy services contractor for all TRICARE beneficiaries." (Id. at ¶ 21). In turn, Express Scripts has a contract with "the Strategic Health Alliance, the Pharmacy

Services Administrative Organization that assists pharmacies like RS Compounding with negotiating representation with Express Scripts." (Id. at ¶¶ 22, 24). "RS Compounding agreed to the terms in the contract between Express Scripts and its Pharmacy Services Administrative Organization when it became a TRICARE provider on June 5, 2009." (Id. at ¶ 25).

The United States alleges that "[f]rom January 1, 2012 to January 31, 2014, the Defendants knowingly submitted, or caused to be submitted, thousands of false claims to TRICARE, which resulted in millions of dollars of reimbursement that would not have been paid but for the Defendants' misconduct." (Id. at ¶ 3). This alleged fraud was brought to the United States' attention by Relator McKenzie Stepe, who worked for RS Compounding as a sales representative from November 2011 to February 2013. (Id. at ¶ 7).

### B. The Alleged Fraud

"In a break with the traditional use of compounded drugs, Defendants took advantage of the high reimbursement rates for compounded prescriptions by mass-producing these compounds and eliminating, or at least sharply reducing, the individualization of the compounds." (Id. at ¶ 35). When wholesale companies sold medications to RS Compounding, they "reported to RS Compounding two prices: the Average Wholesale

Price and the acquisition price." (Id. at ¶ 36). While the "acquisition price was the price RS Compounding actually paid for the medication," the Average Wholesale Price was higher and "was reported to nationally recognized pricing sources and third party payors, including TRICARE." (Id. at ¶ 37). TRICARE "used the reported prices to set reimbursement rates." (Id.).

Indeed, TRICARE "limits the amount it will pay for compound formulations to 'the lesser of the usual and customary price or the maximum allowable cost.'" (Id. at ¶ 23). "[T]he maximum allowable cost for compounded prescriptions is the 'Average Wholesale Price' of the ingredients," meaning "the average price at which wholesalers sell drugs to their customers, including physicians and pharmacies." (Id. at ¶ 26). Under the Express Scripts manual for pharmacies, the usual and customary price is the cash price for a compound: the "retail price of a Covered Medication in a cash transaction at the Pharmacy dispensing the Covered Medication (in the quantity dispensed) on the date that it is dispensed, including any discounts or special promotions offered on such date." (Id. at ¶ 24). "The Express Scripts Manual states that '[a]ll claims submitted must include the Pharmacy's Usual and Customary retail price,

including all discounts on applicable date of fill'" — a requirement to which RS Compounding is allegedly bound. (Id. at ¶¶ 24-25).

Using the pharmacy's "Compounder" software system, RS Compounding "reported the Average Wholesale Price . . . instead of its acquisition cost" in its records. (Id. at ¶¶ 38-39). And, "rather than separately calculating or computing the Usual and Customary cost of [each compounded prescription], the Compounder software had an 'Equalizer' button that made the Usual and Customary cost of the compound equal to the Average Wholesale Price." (Id. at ¶ 40). Thus, when it requested reimbursement for "each compounded prescription, RS Compounding reported to TRICARE both an Average Wholesale Price and a Usual Customary Price," which "[w]ith few, if any exceptions" were the same price. (Id. at ¶ 42). As a result, the United States alleges, "RS Compounding did not separately report to TRICARE the true Usual and Customary price — that is, the price paid by cash paying patients." (Id. at ¶ 43). "Since TRICARE pays the lesser of the Average Wholesale Price and the Usual and Customary Cost, by equalizing the two amounts Defendants guaranteed payment of the inflated Average Wholesale Price." (Id. at ¶ 44).

In short, the United States alleges that, "[f]rom January 1, 2012 until January 31, 2014, RS Compounding sold the exact same compounds to government and cash payors for drastically different prices." (Id. at ¶ 45). The United States provides charts indicating the different rates charged for two of RS Compounding's medications, with the price per gram charged to TRICARE far exceeding the price per gram paid by cash buyers. (Id. at ¶¶ 54, 61). For those two compounded medications, the United States alleges RS Compounding charged between 2,000 and 2,100% "more for the exact same compound than it charged cash payors." (Id. at ¶¶ 55, 62).

The United States also provides charts listing sample claims for drugs with inflated prices that were actually submitted to TRICARE. (Id. at ¶¶ 58, 65). For example, the United States identifies a prescription dispensed on August 15, 2012, for patient C.E. (Id. at ¶ 65). Although the cash price for the 240mg compound prescribed was $30.00, RS Compounding charged TRICARE $990.00. (Id.). According to the United States, "[i]f TRICARE knew it was paying over 2,000% more than cash payors, it would not have paid such high reimbursements to RS Compounding." (Id. at ¶ 57).

Then, "[e]ffective February 1, 2014, RS Compounding altered its reimbursement scheme to stop offering the same

formulations to cash payors and TRICARE." (Id. at ¶ 47). This change was made because, on January 27, 2014, "Silas Raymond, RS Compounding's head pharmacist, was notified that RS Compounding could not seek reimbursement for formula it provided to cash-paying patients at a discounted price." (Id. at ¶ 48). At Raymond's request, Megan Stead, a pharmacy technician and Manager of Customer Service, drafted a new policy. (Id. at ¶ 49). "Instead of extending the same discounts offered to cash paying customers to government payors (like TRICARE), RS Compounding's new policy instead ceased offering the same compounds to cash and insured payors." (Id.). A new formulation was created just for cash payors and "offered cash payors the same low costs." (Id. at ¶ 50). "At that same time [RS Compounding] continued offering its 'custom' formulations to insured patients at inflated rates." (Id.).

According to the United States, the means by which RS Compounding changed its billing practices – i.e. no longer providing the exact same formulations to cash payors and TRICARE, rather than charging TRICARE the lower prices previously charged to cash payors — is meaningful. In the United States' eyes, this decision to continue charging TRICARE high rates confirms that RS Compounding knew "of the

7

unlawfulness of its disparate pricing scheme." (Id. at ¶ 52).
And the United States alleges that, "[d]espite this
knowledge, neither Gobea nor RS Compounding made any attempt
to refund the difference between the price paid by cash payors
and the amount submitted for reimbursement to TRICARE." (Id.
at ¶ 53).

### C.    Gobea's Alleged Personal Involvement

The United States alleges "Gobea knowingly participated
in determining the disparate amounts charged for RS
Compounding's products and, as such, the amounts for which
Defendants submitted claims to the government" and "knowingly
participated in falsely certifying the Usual and Customary
price to TRICARE." (Id. at ¶¶ 80-81). The United States
emphasizes that Gobea is the owner and sole shareholder of RS
Compounding, and that "RS Compounding has no recorded
officers or directors besides Gobea." (Id. at ¶¶ 66, 86).
Gobea was also RS Compounding's highest-paid employee,
receiving a monthly salary of up to $120,000 and taking
"shareholder distributions from the company whenever he
pleased" without a "set schedule or procedure for these
distributions." (Id. at ¶¶ 83-85). The "salary and
distributions Gobea gave himself have significantly impaired

RS Compounding's ability to pay its obligations under the [FCA]." (Id. at ¶ 85).

According to the United States, "[f]ew details about Gobea's business were too small to merit his attention." (Id. at ¶ 73). He hired and fired employees, approved the costs of renewing pharmacy licenses, and approved the use of "a different type of compound base that had a 'significantly higher' Average Wholesale Price." (Id. at ¶¶ 73, 75-76). Gobea "requested that he see every audit response before it was submitted to Express Scripts" and "became involved when legal and regulatory matters arose." (Id. at ¶¶ 75, 77). Gobea was informed by Stead "of the policy change to cease offering identical formulations to TRICARE and cash payors." (Id. at ¶ 82). But, "[d]espite Gobea's knowledge that RS Compounding's prior practices were unlawful, he made no effort to return the exorbitant amounts his company had charged TRICARE." (Id.).

Alternatively, the United States alleges that Gobea at least "deliberately ignored and/or recklessly disregarded the falsity of the information RS Compounding submitted to TRICARE" and "the fraudulent practices of his employees." (Id. at ¶ 68).

**D.** **Procedural History**

On December 16, 2013, Relator Stepe filed her Complaint against RS Compounding and John Doe Corporations 1-10 under seal, alleging violations of the False Claims Act (FCA), 31 U.S.C. § 3729(a), and Florida's state equivalent of the FCA. (Doc. # 1). On April 28, 2017, the Government elected to intervene in part as to the fraudulent pricing allegations, but not as to the "remaining allegations (including [Stepe's] fraudulent marketing and promotional allegations)." (Doc. # 33). The Government filed its Complaint in partial intervention on June 30, 2017, and subsequently filed its Amended Complaint in partial intervention on September 9, 2017, against RS Compounding and Gobea only. (Doc. ## 36, 42). The Amended Complaint in partial intervention asserts claims for various violations of the FCA and for unjust enrichment. (Doc. # 42).

RS Compounding and Gobea filed their Motions to Dismiss the United States' Amended Complaint in Partial Intervention on October 31, 2017. (Doc. ## 74, 75). The United States responded on November 21, 2017. (Doc. # 85). The Motions are ripe for review.

## II. __Legal Standard__

On a motion to dismiss, this Court accepts as true all the allegations in the complaint and construes them in the light most favorable to the plaintiff. Jackson v. Bellsouth Telecomms., 372 F.3d 1250, 1262 (11th Cir. 2004). Further, this Court favors the plaintiff with all reasonable inferences from the allegations in the complaint. Stephens v. Dep't of Health & Human Servs., 901 F.2d 1571, 1573 (11th Cir. 1990)("On a motion to dismiss, the facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.")

However, the Supreme Court explains that:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)(internal citations omitted). Courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

Rule 9(b) of the Federal Rules of Civil Procedure imposes more stringent pleading requirements on claims alleging

fraud. <u>Clausen v. Lab. Corp. of Am., Inc.</u>, 290 F.3d 1301, 1305 (11th Cir. 2002). The complaint must allege "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." <u>Hopper v. Solvay Pharm., Inc.</u>, 588 F.3d 1318, 1324 (11th Cir. 2009).

### III. **Analysis**

Enacted in 1863, the FCA "was originally aimed principally at stopping the massive frauds perpetrated by large contractors during the Civil War." <u>Universal Health Servs., Inc. v. United States ex. rel. Escobar</u>, 136 S. Ct. 1989, 1996 (2016)(internal quotation marks omitted). "Since then, Congress has repeatedly amended the Act, but its focus remains on those who present or directly induce the submission of false or fraudulent claims." <u>Id.</u> The FCA's civil penalties are "essentially punitive in nature" and subject defendants to treble damages plus penalties of up to $10,000 per claim. <u>Id.</u> (internal quotation marks omitted).

The FCA may be enforced by the government or by a relator through a qui tam action brought "in the name of the Government." 31 U.S.C. § 3730(b). Here, the United States has intervened for Stepe's disparate pricing allegations and

alleges violations of three subsections of the FCA, as well as asserting a claim for unjust enrichment. (Doc. # 42).

Gobea and RS Compounding argue that the Amended Complaint in partial intervention does not satisfy Rule 9(b) because Gobea's personal involvement is not pled with particularity, nor are the RS Compounding employees engaged in the fraud specifically identified. (Doc. ## 74, 75). Additionally, RS Compounding argues the allegations plead a mere breach of contract rather than FCA violations, and no obligation to repay the United States is identified for the "reverse false claims" claim. (Doc. # 75 at 5-7).

The Court will address each claim in turn.

## A.    First Claim for Presentation of False Claims

In its first claim, the United States alleges RS Compounding and Gobea violated § 3729(a)(1)(A) of the FCA when they "knowingly presented or caused to be presented false or fraudulent claims for payment or approval." (Doc. # 42 at ¶ 89). "As a result, the United States has suffered damages in the form of millions of dollars in unearned TRICARE payments made to Defendants." (Id. at ¶ 90).

Section 3729(a)(1)(A) imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. §

13

3729(a)(1)(A). The key issue under § 3729(a)(1)(A) is whether the defendant "presented or caused to be presented" a false claim. Urquilla–Diaz v. Kaplan Univ., 780 F.3d 1039, 1052 (11th Cir. 2015)(quoting Hopper, 588 F.3d at 1325–26). The United States "must allege the actual presentment of a claim . . . with particularity, meaning particular facts about the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." Id. at 1052 (internal quotation marks omitted).

"Providing exact billing data — name, date, amount, and services rendered — or attaching a representative sample claim is one way a complaint can establish" presentment of a false claim. United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 704 (11th Cir. 2014). "However, there is no per se rule that an FCA complaint must provide exact billing data or attach a representative sample claim." Id. (citing Clausen, 290 F.3d at 1312 & n.21). Rather, a complaint must contain "some indicia of reliability" that a false claim was actually submitted. Clausen, 290 F.3d at 1311; see also United States ex rel. Patel v. GE Healthcare, Inc., No. 8:14-cv-120-T-33TGW, 2017 WL 4310263, at *6 (M.D. Fla. Sept. 28, 2017)("[A] relator with first-hand knowledge of the defendant's billing practices may possess a sufficient

14

basis for alleging that the defendant submitted false claims." (citing Mastej, 591 F. App'x at 704)).

Here, RS Compounding and Gobea argue that the submission of false claims has not been pled with particularity. Specifically, RS Compounding argues the United States "completely fails to allege which RS Compounding employees assertedly violated the [FCA] by breaching the usual and customary pricing clause in TRICARE's contract with Express Scripts." (Doc. # 75 at 4). RS Compounding also argues that the United States has alleged only a contractual breach of its agreement not to charge TRICARE more than other customers because the United States does not allege that "RS Compounding entered into its contract with Express Scripts on behalf of the TRICARE program with the intent to violate the usual and customary price provision." (Id. at 5).

The Court disagrees. The names of the specific employees who submitted the false claims are not required to satisfy Rule 9(b). For example, in United States ex rel. Matheny v. Medco Health Sols., Inc., 671 F.3d 1217 (11th Cir. 2012), the Eleventh Circuit found that the failure to "specify by name or title the person who actually pushed the send button" on the false claims was not "fatal to Relators' Complaint." Id. at 1230; see also United States v. Berkeley Heartlab, Inc.,

247 F. Supp. 3d 724, 732 (D.S.C. 2017)( "[N]either the FCA nor Rule 9(b) require the identification of individuals within a defendant corporation. The FCA imposes liability on '[a]ny *person* who' commits certain violations, and for the purposes of the FCA, *person* includes corporations." (citations omitted)).

Furthermore, the Court finds that the United States has not merely alleged a breach of contract. True, "[t]he [FCA] is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." Escobar, 136 S. Ct. at 2003 (2016)(internal citation omitted). But some breaches of contract can also violate the FCA, such as when a "contractor, with the requisite scienter, [makes] a request for payment under a contract and 'withh[olds] information about its noncompliance with material contractual requirements.'" United States v. Triple Canopy, Inc., 775 F.3d 628, 636 (4th Cir. 2015), cert. granted, judgment vacated sub nom. Triple Canopy, Inc. v. U.S. ex rel. Badr, 136 S. Ct. 2504, 195 L. Ed. 2d 836 (2016), and opinion reinstated in relevant part, 857 F.3d 174 (4th Cir. 2017)(citation omitted); see also United States ex rel. Yannacopoulos v. Gen. Dynamics, 652 F.3d 818, 824 (7th Cir. 2011)("[A] mere breach of contract does not give rise to

16

liability under the False Claims Act. If the breaching party falsely claims to be in compliance with the contract to obtain payment, however, there may an actionable false claim." (citations omitted)).

"Strict enforcement of the [FCA's] materiality and scienter requirements" is the best means to "ensure that ordinary breaches of contract are not converted into [FCA] liability." <u>United States v. Sci. Applications Int'l Corp.</u>, 626 F.3d 1257, 1270-71 (D.C. Cir. 2010). Here, the United States alleges that RS Compounding and Gobea were aware they were violating a material term of their agreement with the government – to charge TRICARE the same prices as cash payors — but withheld that information in order to receive highly-inflated reimbursements. For the motion to dismiss stage, such allegations go beyond a mere breach of contract by sufficiently alleging materiality and scienter.

In sum, the United States has sufficiently pled with particularity that RS Compounding and Gobea knowingly charged TRICARE highly-inflated rates for drugs, despite their representation that they charge TRICARE the same prices paid by cash payors. Here, instead of employee names, the United States has provided numerous sample claims for specific patients. (Doc. # 42 at ¶¶ 58, 65). And, for various compounds

sold by RS Compounding, the United States provides calculations comparing the total number of grams that were prescribed to TRICARE and cash payors, the total price of those prescriptions, and the price per gram for those prescriptions. (Doc. # 42 at ¶¶ 54, 61). This is sufficient for the pleading stage.

As for Gobea's argument that there are insufficient allegations about his involvement in the fraud and veil piercing, the Court disagrees. Although the United States has not pled an instance of Gobea personally submitting a false claim or statement, it has pled facts about Gobea's "extensive involvement in RS Compounding's day-to-day operations." (Doc. # 42 at ¶¶ 71-87; Doc. # 85 at 12-15). The Court is mindful that Rule 9(b) is a heightened, but not insurmountable, standard. And the Eleventh Circuit has advised that scienter need not be pled with particularity. See Urquilla-Diaz, 780 F.3d at 1051 ("Rule 9(b) provides that a party alleging fraud 'must state with particularity the circumstances constituting fraud' but may allege scienter generally."). Here, the United States has sufficiently pled that Gobea knowingly participated in the alleged FCA violations, or at least deliberately ignored or recklessly disregarded the fraudulent practices.

Furthermore, the United States' allegations provide an adequate basis for piercing RS Compounding's corporate veil and holding Gobea personally liable for the alleged fraud. The federal common-law test for corporate veil piercing asks whether (1) "there is a unit[y] of interest and ownership among Defendants that makes their separate personalities no longer exist" and (2) "an inequitable result would flow from treating Defendants separately." United States ex rel. Lawson v. Aegis Therapies, Inc., No. CV 210-72, 2013 WL 5816501, at *4 (S.D. Ga. Oct. 29, 2013)(citation omitted). The Court agrees with the United States that the Amended Complaint in partial intervention sufficiently alleges that there is a significant unity of interest and ownership between RS Compounding and Gobea. (Doc. # 85 at 15-16). Gobea was RS Compounding's sole shareholder and officer who received a high salary and took "shareholder distributions from the company whenever he pleased." (Doc. # 42 at ¶¶ 66, 83-86).

The United States also argues that it would be unjust to allow Gobea to escape personal liability because Gobea has removed most ill-gotten gains from RS Compounding such that RS Compounding is unable to pay back the millions paid to it by TRICARE. (Doc. # 85 at 16). Indeed, in the Amended Complaint in partial intervention, the United States alleges

that the "salary and distributions Gobea gave himself have significantly impaired RS Compounding's ability to pay its obligations under the [FCA]." (Doc. # 42 at ¶ 85). Thus, at the motion to dismiss stage, the United States' veil piercing allegations suffice.

### B.    **Second Claim for False Records or Statements**

Next, the United States alleges RS Compounding and Gobea violated 31 U.S.C. § 3729(a)(1)(B) because they "knowingly made, used, or caused to be made or used, false records or statements — i.e., the false certifications of its Usual and Customary Price made or caused to be made by Defendants — material to false or fraudulent claims." (Doc. # 42 at ¶ 92). "As a result, the United States has suffered damages in the form of millions of dollars in unearned TRICARE payments made to Defendants." (Id. at ¶ 93).

Section 3729(a)(1)(B) creates liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Thus, "[t]o prove a claim under § 3729(a)(1)(B), [the United States] must show that: (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it to be false, and (3) the statement was material to a false claim." United States ex

rel. Phalp v. Lincare Holdings, Inc., 857 F.3d 1148, 1154
(11th Cir. 2017).

For this provision, the FCA defines "material" as
"having a natural tendency to influence, or be capable of
influencing, the payment or receipt of money or property." 31
U.S.C. § 3729(b)(4). "Under this version of the statute, a
relator is not required to allege presentment because the
statutory language includes no express presentment
requirement." Patel, 2017 WL 4310263, at *8 (citing Hopper,
588 F.3d at 1328).

Defendants argue again that this claim must be dismissed
because it also fails to identify which of RS Compounding's
employees committed the FCA violation and merely alleges a
contractual breach. (Doc. # 75 at 3-5; Doc. # 74 at 5).
Additionally, Gobea again argues that the United States has
failed to "plead facts sufficient to plausibly demonstrate []
Gobea's active role in causing [FCA] violations" and fails to
cite any "facts to support . . . that [] Gobea acted with the
necessary scienter." (Doc. # 74 at 4).

Again, the Court disagrees with these arguments for the
reasons previously explained. The United States has stated a
claim under § 3729(a)(1)(B) with sufficient particularity as
to both RS Compounding and Gobea. The United States explains

in detail how RS Compounding used its Compounder software to "equalize" the Average Wholesale Price and Usual and Customary Prices that would be reported to TRICARE. (Doc. # 42 at ¶¶ 40-44). Therefore, by changing the Usual and Customary Price from the amount actually charged to cash payors to the higher Average Wholesale Price in their records, Defendants allegedly created false statements that were material to a false claim. The United States alleges these false statements were material because TRICARE would not have reimbursed RS Compounding at the higher Average Wholesale Price, if it knew the Usual and Customary Price was actually much lower. (Id. at ¶¶ 57, 64; Doc. # 85 at 6).

Furthermore, the United States alleges Defendants knew their statements about their prices were false – an allegation supported by the fact that an equalizer button was specifically used to increase the apparent Usual and Customary price. (Doc. # 42 at ¶¶ 52, 92). The United States further supports RS Compounding and Gobea's knowledge by alleging that RS Compounding changed its billing in February 2014 so that TRICARE was still billed at inflated prices, but cash payors could no longer purchase the exact compounds provided to TRICARE. (Id. at ¶¶ 49-50; Doc. # 85 at 11). Essentially, the United States contends this new policy did

not reflect RS Compounding's realization that it had violated the law in the past; rather, the policy was an attempt by RS Compounding to refine its pre-existing scheme to bilk the government. Gobea knew of this change in policy, yet took no steps to alter it or reimburse the United States for the amounts that had been illegally charged in the past. (Doc. # 42 at ¶¶ 53, 82). These allegations satisfy Rule 9(b) and this claim survives the motion to dismiss stage.

### C. Third Claim for Avoiding an Obligation to Refund

In its third claim, the United States alleges that RS Compounding and Gobea violated 31 U.S.C. § 3729(a)(1)(G). According to the United States, RS Compounding and Gobea "knowingly made, used, or caused to be made or used, false records or statements — i.e., the false certifications made or caused to be made by Defendants — material to an obligation to pay or transmit money to the government." (Doc. # 42 at ¶ 95). Alternatively, they "knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government." (Id.). "As a result, the United States has suffered damages in the form of millions of dollars in unearned TRICARE payments made to Defendants." (Id. at ¶ 96).

Section 3729(a)(1)(G) creates liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," or who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). "This is known as the 'reverse false claim' provision of the FCA because liability results from avoiding the payment of money due to the government, as opposed to submitting to the government a false claim." <u>Matheny</u>, 671 F.3d at 1222.

"Importantly, to establish a reverse false claim cause of action, a relator must show that the defendant owed a definite and clear 'obligation to pay money to the United States at the time of the allegedly false statements.'" <u>United States v. Space Coast Med. Assocs., L.L.P.</u>, 94 F. Supp. 3d 1250, 1263 (M.D. Fla. 2015)(quoting <u>Matheny</u>, 671 F.3d at 1223)). "Congress has defined a False Claims Act 'obligation' as 'an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment.'" <u>Id.</u> (quoting 31 U.S.C. §

3729(b)(3)). Again, "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

RS Compounding and Gobea argue this claim must be dismissed because it "fails to allege the required 'clear' obligation to repay money to the TRICARE program." (Doc. # 74 at 6; Doc. # 75 at 6). According to them, "the Government has failed to cite to any contractual repayment provision which forms the basis for the required 'clear' repayment obligation." (Doc. # 74 at 6). Furthermore, they argue the United States "fails to adequately allege facts showing RS Compounding [and Gobea were] aware of both a repayment obligation" and their "violation of that obligation." (Id. at 7; Doc. # 75 at 7).

These arguments are unavailing. The Court agrees with the United States that an obligation as defined in § 3729(b)(3) need not be a contractual provision. (Doc. # 85 at 9 n.4). And the United States clearly identifies a non-contractual obligation owed by RS Compounding and Gobea: "the 'concrete' obligation to repay under § 3729(b)(3) and § 3729(a)(1)(G) was triggered when the defendants knew they had received funds to which they were not entitled and retained

the funds instead of returning them." (Id. at 9); see United States v. Crumb, No. CV 15-0655-WS-N, 2016 WL 4480690, at *16 (S.D. Ala. Aug. 24, 2016)(denying motion to dismiss § 3729(a)(1)(G) for failure to allege a clear obligation where the complaint "allege[d] that even in 2014, when they knew the Government was conducting FCA investigations into alleged false claims . . . defendants 'failed to take any corrective or repayment action.'"). "These allegations sufficiently set forth an 'obligation' within the meaning of § 3729(b)(3), specifically 'an established duty . . . arising from . . . the retention of any overpayment,' so as to state a cause of action for a reverse false claim under the post-FERA version of the [FCA]." Crumb, 2016 WL 4480690, at *16; see also Kane ex rel. United States v. Healthfirst, Inc., 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015)("[T]he FCA as amended by the FERA unequivocally provides that to retain — to not return — an overpayment constitutes a violation of the FCA.").

The United States also sufficiently alleges that RS Compounding and Gobea were aware of the obligation to remit overpayments. The United States focuses on RS Compounding's policy change in February 2014, of which Gobea was aware. (Doc. # 85 at 11; Doc. # 42 at ¶¶ 47-53). RS Compounding was notified that it was unlawful to charge TRICARE more than it

charged cash payors for the same compounds, which it had been doing for years. (Doc. # 42 at ¶ 47). Yet, RS Compounding only prospectively changed its practices — by no longer selling the exact same formulations to cash payors and TRICARE. (Id.). Despite knowing TRICARE had overpaid, neither RS Compounding nor Gobea "made any attempt to refund the difference between the price paid by cash payors and the amount submitted for reimbursement to TRICARE." (Id. at ¶ 53).

These allegations meet the particularity requirement of Rule 9(b). Furthermore, the Court agrees with the United States that this claim is not duplicative of the § 3729(a)(1)(A) and (B) claims and is properly pled in the alternative. (Doc. # 85 at 10). Therefore, this claim survives the motion to dismiss stage.

### D. **Fourth Claim for Unjust Enrichment**

In addition to the FCA claims, the United States asserts a claim for unjust enrichment. The United States alleges that, as a result of the alleged fraud, "Defendants were unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience should be returned to the United States." (Doc. # 42 at ¶ 99).

RS Compounding and Gobea argue the unjust enrichment claim is subject to and fails to meet the Rule 9(b) pleading requirement, based on the same arguments they previously raised. (Doc. # 74 at 4; Doc. # 75 at 3). Indeed, some district courts have held that where an unjust enrichment claim is based on alleged fraud, the Rule 9(b) standard applies. See, e.g., Allstate Indem. Co. v. Florida Rehab & Injury Centers Longwood, Inc., No. 615CV1740ORL41GJK, 2016 WL 7177624, at *3 (M.D. Fla. July 26, 2016)(stating that the unjust enrichment claim there sounded in fraud "and must, therefore, meet the heightened pleading standards as set forth in Federal Rule of Civil Procedure 9"); United States ex rel. Citizens United to Reduce & Block Fed. Fraud, Inc. v. Metro. Med. Ctr., Inc., No. 89-0592-CIV, 1990 WL 10519617, at *3 (S.D. Fla. Jan. 11, 1990)("[S]ince the unjust enrichment claim . . . rests on fraudulent taking of money, in connection with the fraud alleged in Counts I and II, it too must satisfy Rule 9(b).").

"A claim for unjust enrichment has three elements: (1) the plaintiff has conferred a benefit on the defendant; (2) the defendant voluntarily accepted and retained that benefit; and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." Virgilio v. Ryland Grp., Inc., 680 F.3d

1329, 1337 (11th Cir. 2012)(citing <u>Fla. Power Corp. v. City of Winter Park</u>, 887 So. 2d 1237, 1241 n. 4 (Fla. 2004)).

Here, just as the Court held for the FCA claims, the Amended Complaint in Partial Intervention satisfies Rule 9(b)'s particularity requirement as to both RS Compounding and Gobea. The United States alleges RS Compounding, and its sole shareholder Gobea, were paid high reimbursements by TRICARE, which they voluntarily retained. (Doc. # 42 at ¶¶ 66, 83-85, 99). Further, the United States argues it would be inequitable for RS Compounding and Gobea to retain that money — the "ill-gotten gains" — because they allegedly used false statements to induce TRICARE into paying more money than Defendants knew they were truly owed. (<u>Id.</u> at ¶¶ 3, 47, 99; Doc. # 85 at 16). Therefore, the unjust enrichment claim survives the motion to dismiss stage.

## IV. <u>Conclusion</u>

The United States' Amended Complaint in partial intervention sufficiently states claims for unjust enrichment and violation of the FCA. Therefore, RS Compounding's and Gobea's Motions are denied. RS Compounding's and Gobea's answers are due December 15, 2017.

Accordingly, it is now

**ORDERED**, **ADJUDGED**, and **DECREED**:

(1)  Defendant Renier Gobea's Motion to Dismiss the United States' Amended Complaint in Partial Intervention (Doc. # 74) is **DENIED.**

(2)  Defendant RS Compounding LLC's Motion to Dismiss the United States' Amended Complaint in Partial Intervention (Doc. # 75) is **DENIED**.

(3)  Defendants' Answers to the United States' Amended Complaint in Partial Intervention are due **December 15, 2017**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 4th day of December, 2017.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE